A97A2327. SMITH v. THE STATE.
(499 SE2d 663)

JOHNSON, Judge.

Cheryll Smith was charged with malice murder and felony murder in connection with the shooting death of her boyfriend, James Brown. A jury found her guilty of voluntary manslaughter. Smith appeals from the conviction entered on the verdict and the denial of her motion for new trial.

1. Smith challenges the sufficiency of the evidence to support the verdict. Viewed in the light most favorable to the verdict, the evidence shows the following: Smith and Brown had been dating for about three years. Brown's friend, Harvey Spruill, lived in Brown's apartment periodically. In the spring of 1995, Smith called Brown's apartment at 2:00 a.m. and asked for Brown. Spruill answered the phone and told her Brown was not there. Smith called back twice that morning, told Spruill she was "tired of this" and said she would "blow [Brown's] f——g head off." The following day, Brown told Spruill that he and Smith had been arguing in Smith's apartment the night before and Brown left. Smith followed Brown, chased him in her car, ran him off the road and fired a gun into the air.

In April 1995, Brown asked police to accompany him to Smith's apartment to retrieve some of his belongings. Brown told the officer who responded to the call that Smith had previously threatened his life and fired a gun at him, and that he did not want any trouble. When Brown and the officer arrived at Smith's apartment, she denied having Brown's property. Brown told Smith to tell the officer about the time she shot at him. Smith argued with Brown and drove away. A month later, Smith moved into Brown's apartment.

Brown's friend of four years, Jefferson Sheets, heard Smith threaten to shoot or kill Brown on more than one occasion. In September 1995, the month of the fatal shooting, Brown's ex-girlfriend was talking on the telephone with Brown when she heard a noise. Brown told her that Smith had pushed him or knocked the phone out of his hand.

On September 13, 1995, just hours before the shooting, Sheets went to Brown's apartment and noticed broken glass on the living room floor and a gun on the living room table. Sheets noted that Brown normally kept a gun on the television or on the table. Brown told Sheets he was unhappy with Smith and was going to ask her to leave his apartment. Brown told Sheets he was concerned about how Smith would react, thinking she might "go off." The two men went out for a while, and Sheets dropped Brown at the gate to his apartment complex at about 11:00 p.m. Smith came to Brown's apartment around 1:00 a.m. At 2:30 a.m., Smith called police and reported that Brown had been shot. When police arrived two to three minutes later, they found Brown dead on the living room floor with a gunshot wound to the head.

Smith told officers at the scene that she and Brown had been arguing and that both reached for the nearby gun to prevent the other from getting it. They struggled, and the gun discharged. A short time later, at the police station, Smith gave a recorded statement saying that she and Brown "got into an argument and he was like telling me to get out again. . . . We been arguing for about really

for like the last, I don't know . . . how long." The argument was only verbal at that point. Smith stated that as she went to turn the television on, Brown must have thought she was going to get the gun, which was on top of the television, and he moved toward her. Smith said she grabbed the gun, swung it toward Brown, they wrestled, and the gun discharged, striking Brown. Forensic testing was conducted on the 9mm pistol; it could not be made to fire accidentally or malfunction.

A person commits voluntary manslaughter when she kills another person, under circumstances which would otherwise be murder, and acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person. OCGA § 16-5-2 (a). Although Smith claimed she did not intend to fire the gun, her intent and whether she acted in the heat of passion or with justification depended largely on the credibility of the witnesses, which was for the jury to assess. See *Brown v. State*, 225 Ga. App. 218, 219 (483 SE2d 633) (1997). The evidence was sufficient to authorize the jury to find Smith guilty of voluntary manslaughter beyond a reasonable doubt.

2. Smith contends the trial court erred in not permitting defense counsel to ask Smith's witnesses what Smith had told them about prior difficulties between her and Brown, and in allowing the state's witnesses to testify about statements Brown made to them about the couple's difficulties.

(a) At issue is the following testimony of the state's witnesses: Spruill's testimony that Brown told him that a day earlier Smith chased him in his car and fired a gun into the air; Sheets' testimony that Brown told him he was going to break up with Smith and that he was concerned she would "go off" on him; the ex-girlfriend's testimony that Brown said Smith pushed him or knocked the phone out of his hand; and the officer's testimony that Brown told him Smith had threatened his life in the past.

While hearsay may not be admitted solely because it concerns prior difficulties, the testimony at issue falls within the necessity exception to the hearsay rule. Hearsay may be admitted based on necessity if (1) there is necessity, and (2) there are particularized guarantees of trustworthiness. *McKibbons v. State*, 226 Ga. App. 452, 454 (2) (486 SE2d 679) (1997). Because the declarant is deceased, the necessity element of the necessity exception is satisfied in this case. The crucial question is whether the statements were made under circumstances that indicate they were trustworthy. See *Holland v. State*, 267 Ga. 833, 837 (3) (483 SE2d 584) (1997). "As to the second requirement, the declaration of the decedent is admissible when it is coupled with circumstances which attribute verity to it. [Cits.]" *Roper v. State*, 263 Ga. 201, 202 (2) (429 SE2d 668) (1993).

Spruill was the victim's best friend and roommate. They worked together and were friends for three or four years. The victim told Spruill about the chase and prior shooting incident after Spruill asked the victim what happened the night before. Spruill questioned the victim after Smith kept calling the apartment upset, and said she would "blow [Brown's] . . . head off." Considering the circumstances, including Smith's conversations with Spruill the night before and the close relationship between Spruill and the victim, there were sufficient indicia of trustworthiness. See *McKibbons*, supra.

Similarly, the statement to Sheets concerning Brown's intent to break up with Smith and his concern about her reaction was made in confidence, as Brown sought advice from his friend. The testimony of Brown's close friends recounting Brown's description of Smith's assault and threats near the time of the killing bore particularized guarantees of trustworthiness and were properly admitted under the necessity exception to the hearsay rule. See *McMichen v. State*, 265 Ga. 598, 604 (4) (a) (458 SE2d 833) (1995).

Brown's statement to police explaining why he wanted them to escort him to Smith's apartment also had sufficient indicia of reliability. Brown had no apparent reason to lie to the police about why he felt he needed a police escort to retrieve his belongings from Smith's apartment. The fact that Brown confronted Smith with the accusation in the officer's presence is further indication of the statement's reliability. The totality of the circumstances surrounding the making of the statement indicates its trustworthiness. See *Dix v. State*, 267 Ga. 429, 431 (2) (479 SE2d 739) (1997).

Finally, the statement to the ex-girlfriend, explaining the noise while Brown was on the phone, was admissible as coming within the res gestae exception to the hearsay rule. See OCGA § 24-3-3.

(b) The trial court did not commit reversible error by refusing to allow Smith's witnesses to testify about certain statements she made to them. Smith argues the trial court should have allowed testimony of her sister, LaCresha Brooks, regarding who Smith said inflicted scratches, bruises and a burn upon her; Michelle Mitchell, regarding which abusive relationship Smith should leave; and Sharon Kendrick, regarding who Smith said inflicted bruises on her.

Assuming this evidence was admissible, and that Smith could satisfy the requirements of the necessity exception to the hearsay rule, the testimony was merely cumulative of other evidence admitted at trial. For example, Smith's mother testified that she saw bruises on Smith's body and that when she confronted Brown, he admitted he had been "physical" with Smith. In addition, in her statement read at trial, Smith stated that she and Brown got into fights, that he was stronger than her, that he "always comes at [her] . . . grabbing [her] face . . . that kind of stuff," that he bruised her

by grabbing her, and that he left a scar on her shoulder.

Similarly, the trial court allowed LaCresha Brooks to testify that she noticed scratches on Smith's neck and chest, a burn on her ankle, and bruises on her ears. Brooks testified that Smith told her who inflicted the injuries and, as a result of what Smith told her, she advised Smith to leave Brown.

Sharon Kendrick was permitted to testify that she observed marks and bruises on Smith, that she and Smith talked about the marks, and that Kendrick advised Smith to move out.

In addition, Michelle Mitchell testified that the day before the fatal shooting she observed a burn on Smith's shoulder, discussed the matter with Smith, and advised her to "get out of that situation . . . as soon as possible." Considering the testimony which was admitted, any error in not admitting the prior statements at issue was rendered harmless. See *Ware v. State*, 252 Ga. 90, 91 (4) (310 SE2d 908) (1984).

3. Smith contends that the trial court erred in not suppressing statements she made while in custody at the police station when police continued to interrogate her after she made what was at least "an 'equivocal' or 'ambiguous' request" for an attorney. She argues that officers should have "clarified what her request was and gotten a clear response that she was willing to talk to them without an attorney." We disagree.

A *Jackson v. Denno* hearing was held prior to trial to determine the admissibility of Smith's custodial statements. The evidence adduced at the hearing showed the following: Smith was taken to the police station immediately after the shooting. Detectives read her *Miranda* rights, including the right to have an attorney present and to not answer any questions. When asked if she wanted to talk about the case, Smith replied: "[S]o if I want an attorney right now, what do I do?" The investigator responded that if she wanted an attorney, she could request one, and that the court would appoint an attorney if she could not afford to hire one. Smith said: "O.K., yes, I don't, I mean. . . ." Detective: "We're investigating a homicide, Cheryll." Smith: "Please, please, don't." Detective: "I know you don't want to hear the word, but listen to me." Smith: "Just — no. I just don't know what to do." Detective: "Right." Smith: "I mean, I can tell you what happened." Detective: "Right." Smith said she "can't deal with this." The detective told her they were going to ask her what happened in the apartment. When Smith began telling what happened, the detective asked her if she understood her rights. Smith said: "Yes, I understand those." The detective asked if she wanted to talk, to which Smith replied "I don't know. I mean, I just — I don't — ." The detective told Smith it was up to her, and that it was her decision to make. He gave her the waiver form, read it to her, and asked her to fill it

out. Smith again stated she did not know what to do. The detective asked if she wanted him to give her time to think about it. Smith replied that she could not believe this was happening and began talking about how Brown fought her. The detective asked her to read and sign the form, then told her he would give her some time to think about it.

Detectives left and returned about 40 minutes later. They asked Smith if she had been advised of and understood her rights. She said "Yes." Smith apparently signed the waiver form at that time and gave her oral statement. The signed "Statement of Miranda Rights" and waiver form is part of the record.

We agree with the trial court's determination that Smith did not assert her right to counsel before making the statement to police. It is true that law enforcement officers must immediately cease questioning a suspect who has clearly asserted a right to have counsel present during custodial interrogation. *Jordan v. State*, 267 Ga. 442, 444 (1) (480 SE2d 18) (1997). Smith's statements, however, did not clearly communicate a request for counsel. Therefore, officers were not required to stop questioning her.

Even were we to agree with Smith, arguendo, that she made an ambiguous request for counsel, there was no error. Contrary to Smith's position, officers were not required to seek clarification from her before continuing any interrogation. "After a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney. . . . We decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning [her]. *Davis v. United States*, [512 U. S. 452 (114 SC 2350, 129 LE2d 362) (1994)]." *Jordan*, supra at 445. Our courts have recently held that statements such as "I guess I need a lawyer," "(m)aybe I should talk to a lawyer," and "[I don't] know what to do," are not unambiguous requests for counsel and do not obligate officers either to stop questioning or to obtain clarification from a detainee before continuing. See *Tucker v. State*, 228 Ga. App. 321, 322-323 (1) (a) (491 SE2d 420) (1997). The trial court did not err in denying Smith's motion to suppress the statement.

4. There is no merit to Smith's enumeration that the trial court should have given her requested charges on involuntary manslaughter and mutual combat.

(a) An involuntary manslaughter charge was not authorized. Smith argues there was evidence she unintentionally shot Brown while committing a lawful act, specifically, trying to defend herself. However, a charge on involuntary manslaughter is not required where the defendant asserts using a gun in self-defense, even where

the gun accidentally discharges. See *Lamon v. State*, 260 Ga. 119, 120 (2) (390 SE2d 582) (1990). We also note that the trial court charged on accident and self-defense. We find no error.

(b) Nor was a charge on mutual combat authorized, inasmuch as there was no evidence that Brown and Smith were both armed with deadly weapons and mutually intended or agreed to fight. See *Holcomb v. State*, 268 Ga. 100, 105 (6) (485 SE2d 192) (1997).

5. Smith argues that the trial court erred in denying her *Batson* motion, in which she claimed the state discriminated against African-American jurors in its use of peremptory strikes. We find no reversible error.

After the jury was selected but before it was sworn, the trial court asked counsel if they had any objections to the jury. Smith's attorney stated that he objected to the procedure, but did not elaborate at that time. The trial court remarked that it was late in the day and that they would finish in the morning. The next morning, Smith's attorney voiced three objections to the procedure used to select the jury, one of which was a *Batson* challenge. Smith's counsel stated that the panel consisted of 27 white and 24 African-American jurors and that the state used all six of its peremptory strikes against black veniremen. The trial judge remarked that defense counsel should have raised the *Batson* issue the evening before, prior to the stricken panel members being excused. A challenge made at this point, the court found, was untimely. The court went on to find that Smith had not proven a *Batson* violation, noting that no evidence had been presented as to the racial composition of the panel or the jury as selected.

Although it would have been preferable for Smith to make the *Batson* objection before the panel had been excused so that any problem could be easily remedied, Smith's *Batson* challenge was timely because it was made before the jury was sworn. Compare *Greene v. State*, 260 Ga. 472, 473 (1) (396 SE2d 901) (1990). Nonetheless, the court's finding that the *Batson* objection was untimely was harmless, since the trial court did consider the motion. As the trial court stated, other than defense counsel's verbal statement above as to the makeup of the panel and the state's six strikes, there was no competent evidence of the racial composition of the panel or resulting jury.

"Under the initial prong of *Batson*, the defendant has the burden to establish a prima facie case of racial discrimination as a result of the state's use of its strikes. To do so, [Smith] was required to show that [she] is black; that the prosecutor exercised peremptory strikes to remove blacks from the petit jury, and that these facts and other relevant circumstances, including relevant statistical data as to the racial composition of the petit jury panel, the strikes exercised by both parties, and the racial composition of the resulting jury, raise an

inference that the prosecutor struck blacks from the petit jury on the basis of race. [Cits.]" *Woods v. State*, 208 Ga. App. 565, 566 (2) (431 SE2d 167) (1993). Smith had the burden of completing the record with information revealing the racial composition of the panel from which the jury was selected, the breakdown of the strikes of both parties, and the racial composition of the resulting jury. The colloquy between the court and counsel does not suffice. See id. at 566; *Shaw v. State*, 201 Ga. App. 438, 439-440 (1) (411 SE2d 534) (1991). Smith failed to carry her burden to show by the record facts necessary to prove her *Batson* claim. See *Shaw*, supra at 440 (1).

6. Smith claims the trial court erred in denying her claim of ineffective assistance of trial counsel. She argues that trial counsel failed to adequately consider, investigate and evaluate whether to present the battered woman syndrome theory as part of her defense and to retain an expert in that field to assess Smith and testify on her behalf. At the hearing on the motion for new trial, Smith's trial counsel stated that at the time of the trial he was familiar with the battered woman syndrome and was familiar with leading case law on the theory. Counsel conducted legal research and also discussed the syndrome with a psychologist. Defense counsel concluded that, based on the evidence, particularly Smith's own statement in which she never claimed to be afraid of Brown and in which she said they were both going for the gun to keep the other from getting it, he would not be able to convince a jury that Smith fit within the theory. Counsel testified that he did not believe that the syndrome would be a viable strategy given the facts of this case.

The constitutional right to assistance of counsel "ensures the defendant that his counsel will sufficiently investigate the facts of the case, adequately research the law, and then present the case in a competent and reasonably effective manner. [Cit.]" *Berryhill v. Ricketts*, 242 Ga. 447, 450 (3) (249 SE2d 197) (1978). Smith's trial counsel did these things and then, in his reasoned judgment, determined that assertion of the battered woman syndrome defense in this case was unrealistic. See id. The decision not to pursue a defense is one of trial strategy with which we will not generally interfere. "Trial strategy and tactics do not equate with ineffective assistance of counsel." (Citations and punctuation omitted.) *Polk v. State*, 225 Ga. App. 257, 259 (1) (c) (483 SE2d 687) (1997).

Smith also claims trial counsel failed to research suppression and *Batson* issues. As discussed above, the motion to suppress Smith's statement to police was properly denied. Smith has failed to show that a new trial would have been granted based on either the *Batson* or the suppression issues. See *Polk*, supra at (1) (d). The trial court did not err in finding that trial counsel's representation of Smith did not amount to ineffective assistance of counsel.

7. Smith's enumerations claiming that the trial court erred in denying her motion for new trial and that the trial was fundamentally unfair, which were based on the foregoing arguments, are similarly without merit.

*Judgment affirmed. Pope, P. J., and Blackburn, J., concur.*

DECIDED MARCH 6, 1998 —
RECONSIDERATION DENIED MARCH 27, 1998 

*John A. Pickens*, for appellant.

*J. Tom Morgan, District Attorney, Desiree S. Peagler, Elisabeth G. Macnamara, Priscilla E. N. Carroll, Assistant District Attorneys*, for appellee.