A00A0326. MORRIS v. THE STATE.
(534 SE2d 509)

ANDREWS, Presiding Judge.

Franklin Morris appeals from the judgment entered on the jury's verdict of guilty of aggravated assault, challenging the sufficiency of the evidence and the court's upholding of the State's challenges, pursuant to *Georgia v. McCollum*, 505 U. S. 42 (112 SC 2348, 120 LE2d 33) (1992), to two of Morris' peremptory strikes. Finding the evidence legally sufficient and the challenges properly upheld, we affirm.

1. Considering first the fourth enumeration which challenges the sufficiency of the evidence, viewed in favor of the jury's verdict, the evidence was that Morris had previously been the boyfriend of Sheila Curtis who, at the time of the assault on March 8, 1999, had been romantically involved with Rose Hampton, the victim, since November 1998.

Hampton worked at a Subway Shop next door to the Herb Shop where Curtis worked. On March 4, 1999, around 11:00 p.m., Hampton was at Curtis' apartment when Morris unexpectedly arrived. Curtis' roommate, Willie, let Morris in, and he immediately proceeded to the back of the apartment where Curtis was. After approximately 30 minutes, Hampton left the apartment and went to move her Chevrolet S-10 pickup behind Morris' green Cadillac in the parking lot so he could not leave. She then saw Morris and Curtis leave the apartment, and Morris accused Hampton of having his car keys. Hampton denied having the keys but asked Curtis to come with her. Words were exchanged between Morris and Hampton, after which Morris reached in his pocket and pulled out a knife. At that point, Hampton pulled her .380 semiautomatic handgun from her jacket and pointed it at Morris. Hampton said she had carried the gun since January when she became aware of threats made against her by Morris. At that point, Morris, who had run behind parked cars, said that Hampton had the upper hand, but "he'll get [her] later." Curtis got in the truck with Hampton, and they left.

On March 8, 1999, Hampton escorted Curtis to her car after work. Curtis' daughter Tonya had borrowed the car that day and returned it to the shopping center around 6:30 p.m. Tonya Curtis, her four children, and Curtis left in Curtis' car. Hampton originally got in a car with Willie to go to Tonya Curtis' house. Hampton, however, saw Morris' car leave a Texaco station in the shopping center and pull in behind Curtis. Hampton had Willie return her to her truck, and she proceeded to Tonya Curtis' home on Barbarie Lane.

Curtis was driving toward Decatur when Hampton called and told her Morris was following her. Curtis continued to Decatur where she pulled into a law office parking lot to avoid Morris. Morris continued on, and Curtis and the others went to Curtis' apartment instead of Tonya Curtis' home.

Hampton had proceeded to Tonya Curtis' home where she pulled into the driveway. Curtis' car was not there, so she began to back out of the driveway. She then noticed Morris' car coming up Barbarie Lane, a dead-end cul-de-sac. She waited for him to pass and then turned toward the cul-de-sac, where Morris was headed, so he would not be behind her. As Morris made the circle and headed back toward Hampton, their vehicles pulled side by side, and Morris fired three shots at Hampton's truck. One hit the front of the truck, one hit the

driver's door, and one hit the camper on the truck. Although Hampton felt a "sting," she was not directly hit by a shot. Morris waited while Hampton went around the circle and drove off when she drove up behind him. During this incident, Hampton did not pull or point her gun at Morris.

Hampton immediately drove to the DeKalb police station and made a report around 8:00 p.m. The truck was examined, and three defects which appeared to be bullet holes were found. The driver's window was shattered, and a spent bullet was removed from the driver's seat. Hampton also turned over to police, on March 10, two bullet casings which she had found on Barbarie Lane and her .380 handgun for analysis. Police records revealed that a Signal 23 (shots fired) was received from the Barbarie Lane neighborhood at 7:29 p.m.

A firearms expert testified that she had examined the two 9mm cartridges, the lead core found in Hampton's truck, and the .380 handgun. She opined that the two 9mm cartridges were fired by the same 9mm handgun. The lead core was found to have markings (cannelures) on it which had been pressed into the bullet jacket and had imprinted onto the lead core. According to the expert, .380 bullets do not have cannelures, but some 9mm cartridges do. Also, it is not possible to fire a 9mm cartridge from a .380 handgun.

Two of Curtis' daughters were contacted by Morris before trial and asked to provide an alibi for him during the time of the shooting, although they had not been with him.

A rational trier of fact could have found Morris guilty of aggravated assault based on this evidence. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Caldwell v. State*, 237 Ga. App. 568 (1) (515 SE2d 868) (1999).

2. The first three enumerations all deal with the three-part procedure required by *McCollum*, supra, regarding challenges to a defendant's peremptory strikes and are considered together.

(a) The first enumeration, that the trial court erred in finding that the State had made out a prima facie case of racial discrimination by Morris, who is African-American, because he used eight of his ten peremptory strikes on Caucasian jurors, is moot because Morris offered purportedly race-neutral reasons for the strikes and the court ruled on the ultimate question of intentional discrimination. *Williams v. State*, 236 Ga. App. 190 (1) (511 SE2d 561) (1999); *Jackson v. State*, 220 Ga. App. 98 (469 SE2d 264) (1996).

The cases relied upon by Morris, *Collins v. State*, 232 Ga. App. 651, 654 (2) (502 SE2d 498) (1998); *Smith v. State*, 231 Ga. App. 677, 683 (5) (499 SE2d 663) (1998); and *Shaw v. State*, 201 Ga. App. 438, 439 (1) (411 SE2d 534) (1991), all involved situations where no prima facie showing was made in the trial court, so the trial court did not examine reasons given for the strikes and make a determination

regarding purposeful discrimination.

Here, the trial court did fully examine the strikes and make a determination, making the issue of the prima facie showing moot. *Drane v. State*, 271 Ga. 849, 851, n. 3 (523 SE2d 301) (1999); *Odom v. State*, 241 Ga. App. 361, 363 (2) (526 SE2d 646) (1999).

(b) Morris next contends that the trial court erred in placing the ultimate burden of persuasion on him, in violation of *McCollum*, supra.

In the second step of the *McCollum* challenge, "the proponent of the strike is required to set forth a race-neutral, case-related, clear and reasonably specific explanation for the exercise of its strikes. *Barnes v. State*, 269 Ga. 345, 349 (6) (496 SE2d 674) (1998)." *Curry v. State*, 238 Ga. App. 511, 513 (1) (519 SE2d 269) (1999). If such a reason is given, "the ultimate burden of persuasion regarding motivation rests with, and never shifts from, the opponent of the strike. [*Jackson v. State*, 265 Ga. 897, 899 (463 SE2d 699) (1995)]." *McGlohon v. State*, 228 Ga. App. 726, 727 (1) (492 SE2d 715) (1997) (physical precedent only).

Here, the State challenged Morris' strikes of jurors 3, 7, and 31. The court accepted Morris' reason for striking juror 3, an Internal Revenue Service agent, as racially neutral and upheld that strike.

Juror 7, according to Morris, was of a conservative bent because she had three older children; had moved to Georgia from Clarksville, Tennessee, a conservative community; and was married to a retired Army man. The court allowed the State to respond, and it was pointed out that she was not in fact married to a retired military man, but to a retired contract painter, and had lived in Tennessee for only a short period of time.

The court then inquired of Morris to further explain his determination that juror 7 was of a conservative bent.

The trial court did not specifically state, in step two, that he accepted the reasons given by Morris as race-neutral and then specifically inquire of the State to show that the explanations were pretexts for discrimination, although he did do so when inquiring regarding jurors 3 and 31. After Morris' explanation of his reasons and the State's response, the court stated that, while having older children could theoretically be race-neutral, it was not a real reason for striking anyone and that others on the jury had similar family situations. Although the record could be clearer regarding juror 7, the record as it stands shows that the trial court did not clearly err in reseating juror 7. *Tillman v. State*, 240 Ga. App. 78, 79 (1) (522 SE2d 557) (1999); *Wilburn v. State*, 230 Ga. App. 619, 623 (497 SE2d 380) (1998) (physical precedent only).

(c) Finally, Morris argues that the trial court abused its discretion in determining that the State had met its burden of persuasion.

In addition to juror 7, Morris objected to the reseating of juror 31, whose brother-in-law was in law enforcement and who was not familiar with the geographic area involved. The trial court was persuaded by the State's pointing out that four African-American jurors who had relatives in law enforcement and were not familiar with the area were accepted by Morris.

Here, "the state met its burden of showing that [Morris'] proffered reason was a pretext for discrimination by showing that he had failed to strike similarly situated jurors of a different race." *Blair v. State*, 267 Ga. 166, 167 (2) (476 SE2d 263) (1996). See also *McGlohon*, supra.

*Judgment affirmed. Ruffin and Ellington, JJ., concur in the judgment only.*

DECIDED MAY 4, 2000.

*Peter M. Zeliff,* for appellant.
*J. Tom Morgan, District Attorney, Maria Murcier-Ashley, Assistant District Attorney,* for appellee.