A97A2587. WILBURN v. THE STATE.
(497 SE2d 380)

RUFFIN, Judge.

A jury found Freddie Lee Wilburn guilty of selling cocaine in violation of the Georgia Controlled Substances Act. Wilburn appeals, contending that the trial court erred in denying his motion to suppress evidence and seating jurors he attempted to strike. For reasons which follow, we affirm.

1. Wilburn asserts that the trial court erred in denying his motion to suppress evidence that he possessed marijuana when he was arrested. We disagree. In our review of the trial court's order denying Wilburn's motion to suppress, we construe the evidence most favorably to uphold the court's ruling. *Mao v. State*, 222 Ga. App. 482, 483 (474 SE2d 679) (1996). It is the trial court's duty to resolve conflicts in the evidence, and its findings of credibility and fact will not be disturbed on appeal unless they are clearly erroneous. Id.

Viewed in this light, the record shows that a warrant was issued for Wilburn's arrest on July 9, 1995. The warrant was based on a July 7, 1995 purchase of $20 of crack cocaine from Wilburn by undercover officer Joseph Walker of the Austell Police Department. After the

purchase, Walker identified Wilburn in police photographs. The following evening Walker again purchased cocaine from Wilburn. During this second purchase, Walker gave Wilburn $20 for more cocaine. Before Wilburn left to obtain the cocaine, however, Walker told Wilburn that he wanted some assurance that Wilburn would return with the cocaine or his money. In response, Wilburn gave Walker an identification card that contained Wilburn's photograph and full name.

Wilburn was subsequently arrested during the early morning hours of August 13, 1995. At 12:30 a.m., Walker was in uniform patrolling in a marked police car with another officer. Walker testified that he noticed a car speeding toward him with one headlight and that they turned on their blue lights and initiated a traffic stop. When Walker approached the car on foot, he observed four individuals inside, one of which was Wilburn. Walker testified that because he still had undercover investigations pending in the area which he did not want to jeopardize, he withdrew from the scene, went back to the police car and called for backup. According to Walker, after the four occupants exited the vehicle, "the driver was found to be DUI." The other occupants were questioned by police officers. When it was determined that the vehicle would be impounded, the other occupants were moved "a safe distance" away, and Walker searched the car. During his search he found a bag of suspected marijuana where Wilburn was sitting. After being asked by the officers who the bag belonged to, Wilburn stated that it was his. Wilburn was then placed under arrest for possession of marijuana and pursuant to the arrest warrant, for selling cocaine. It is undisputed that at the time of the traffic stop all the officers involved knew there was an outstanding warrant for Wilburn's arrest.

Wilburn moved to have evidence that he possessed marijuana suppressed on the ground that he admitted ownership of the bag during a custodial interrogation, but before he was read his rights pursuant to *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). He claims that because there was an outstanding arrest warrant of which the police officers were aware, they should have informed him of his rights immediately upon stopping the vehicle. We disagree.

Similar circumstances were presented to this Court in *Quinn v. State*, 209 Ga. App. 480 (2) (433 SE2d 592) (1993). In *Quinn*, the arresting officer obtained an arrest warrant and went to defendant's house to arrest him. Before he arrested the defendant, the officer questioned him about a gun used in a shooting and asked the defendant if he owned such a weapon. The defendant responded that he did and retrieved the gun for the officer. The defendant was thereafter arrested. We observed that under *Miranda*, custodial interrogations "mean questioning initiated by law enforcement officers after a per-

son has been taken into custody or otherwise deprived of his freedom of action in any significant way." (Punctuation omitted.) Id. at 481. Citing *Ingle v. State*, 123 Ga. App. 56 (179 SE2d 305) (1970), we concluded that "[t]his is not the sort of in-custody interrogation forbidden by the Miranda case without prior warning to the defendant, regardless of whether the peace officer, who had not arrested the defendant at that point, would have done so if he had attempted to leave the scene." (Punctuation omitted.) Id. at 482. " '[T]he issue of custody involves an objective standard: Would a reasonable person in the defendant's situation have believed that he was physically deprived of his freedom of action in any significant way? If not, he is not subject to the compulsive atmosphere of an actual arrest, and *Miranda* does not apply. [Cits.]' [Cit.]" Id.

In this case, we find that a reasonable person in Wilburn's place would not have believed that his freedom was curtailed in a significant way when he was asked who owned the bag of marijuana. The questioning took place during what was otherwise a fairly routine traffic stop, and Wilburn, who was not the driver, was not the subject of that investigation. Moreover, the question regarding the marijuana was directed to all the passengers, not just Wilburn. Finally, there was absolutely no evidence showing that Wilburn knew there was a warrant for his arrest or that he was even the subject of an undercover investigation. Under these circumstances, we do not find that the trial court's denial of Wilburn's motion was clearly erroneous. See id.; *Mao*, supra.

2. We also find no merit in Wilburn's assertion that the trial court erred in seating on the jury two veniremen he attempted to strike. The transcript shows that during jury selection, the State objected to Wilburn's peremptory strikes against juror numbers 22 and 23, both white, on the ground that the strikes were racially motivated. Wilburn, an African-American, was represented by counsel who volunteered his reasons for striking the two veniremen. Wilburn's counsel explained that he struck juror number 22 because during voir dire the juror stated that he had been a burglary victim, that he had prior jury experience and that he lived in the same area of Cobb County as Wilburn and might be familiar with some of the witnesses in the case. The trial judge did not expressly rule on the racial neutrality of the explanation, but rather asked the State for a response. The assistant district attorney countered that juror number 22 specifically stated that he was not familiar with any witnesses and that Wilburn did not strike an African-American juror who was also a burglary victim. Wilburn's counsel explained that he struck juror number 23 because the juror stated that he had previously served as a jury foreman and because, other than fishing, he had virtually no interests outside the home and "like[d] to watch the cop

shows on TV. . . ." The trial court again did not rule on the racial neutrality of the explanation but allowed the State to respond. The assistant district attorney stated that the strike must have been racially motivated because Wilburn accepted another juror who complained about the number of times that she served on a jury and also accepted other jurors who had few interests outside the home. The trial court reseated both jurors following the State's response to each of Wilburn's explanations.

We note initially that in *Georgia v. McCollum*, 505 U. S. 42 (112 SC 2348, 120 LE2d 33) (1992), the United States Supreme Court extended the principles established in *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986) and held that "a criminal defendant may not engage in 'purposeful discrimination on the ground of race in the exercise of peremptory challenges.' [Cit.]" *Jackson v. State*, 265 Ga. 897, 898 (2) (463 SE2d 699) (1995). In determining whether a criminal defendant has purposefully exercised his or her peremptory challenges in a racially discriminatory manner, a trial court must employ the three-step burden shifting inquiry announced in *Purkett v. Elem*, 514 U. S. 765 (115 SC 1769, 131 LE2d 834) (1995). This inquiry generally requires that the opponent of a peremptory challenge establish a prima facie case of racial discrimination (step 1). Id. at 131 LE2d 834, 839. "[T]he burden of production [then] shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful racial discrimination. [Cits.]" Id. This Court is required to review the findings of the trial court with great deference and cannot disturb such findings unless they are clearly erroneous. *Jackson*, supra at 900.

In this case, step one of the inquiry was moot because Wilburn, the proponent of the strikes, proffered his purportedly race-neutral reasons for the strikes. See *Leeks v. State*, 226 Ga. App. 227, 228 (3) (483 SE2d 691) (1997). Steps two and three of the inquiry, however, present a problem frequently encountered by this Court in reviewing a trial court's findings in these matters: the record does not clearly show that the court first determined that Wilburn (the proponent) tendered a race-neutral explanation in step two before evaluating the persuasiveness of the justification and determining the ultimate issue of purposeful racial discrimination in step three. See, e.g., *Leeks*, supra; *O'Neal v. State*, 226 Ga. App. 224, 225-226 (1) (482 SE2d 478) (1997) (physical precedent only). Indeed, this same problem resulted in a reversal in *Purkett* and was the subject of much of the dissent's opinion in that case. See *Purkett*, supra, 131 LE2d at 839, 840 (Justice Stevens dissenting).

Having identified the problem, we believe it worth noting that

there is a rather simple solution. The trial court must not only utilize the *Purkett* analysis, but should also clearly state on the record its reasoning and conclusions as to each step of the inquiry. The interests at stake surely warrant such attention, and a clear record allows a more thorough and complete review of the trial court's decision.

Although a clearer record would have allowed a more thorough review of the decision in this case, the record as it stands is sufficient to establish that the trial court did not clearly err in reseating the jurors. As for step two of the inquiry, the reasons tendered by Wilburn were race-neutral. Wilburn's explanations were not based on the race of the jurors, nor was a discriminatory intent inherent in his explanations. See *Jackson*, supra at 898 (citing *Purkett*). And, while the record shows that the trial court did not specifically rule on the racial neutrality of Wilburn's explanations, neither does it show that the court necessarily based its decision to reseat the jurors on a finding that the reasons were not race-neutral. Had the trial court found that the reasons were not race-neutral and reseated the jurors based on such a finding, that ruling would have been clearly erroneous and resulted in a reversal here. See *Purkett*, supra; *Jackson*, supra; *Leeks*, supra; and *O'Neal*, supra. But the record shows that the trial court continued its inquiry by asking the State to respond to Wilburn's explanations and only after these responses were provided did the trial court reseat the jurors. Under these circumstances, the trial judge could have accepted Wilburn's explanations as race-neutral without expressly ruling so (step two), but chose to disbelieve them following the State's response (step three). Accordingly, although a clearer record would allow us to rely less on implication and more on the actual findings of the trial court, based on this unclear record we cannot conclude that the trial court *clearly erred* in reseating the stricken jurors. See *Purkett*, supra; *Jackson*, supra.

*Judgment affirmed. Birdsong, P. J., concurs specially. Eldridge, J., concurs specially and in judgment only in Division 2.*

BIRDSONG, Presiding Judge, concurring specially.

I concur fully with all that is said in the majority opinion, but I write separately to respond to Judge Eldridge's special concurrence. Even though I concurred in Judge Eldridge's opinion in *Gardner v. State*, 225 Ga. App. 427 (483 SE2d 912) (physical precedent), and did not respond to his special concurrence in *McGlohon v. State*, 228 Ga. App. 726 (492 SE2d 715) (physical precedent), upon further reflection I cannot agree with his view that *Purkett v. Elem*, 514 U. S. 765 (115 SC 1769, 131 LE2d 834) is not applicable to the trial court's analysis in a *Batson/McCollum* challenge.

More significantly, however, I believe this theory expressed in the concurring opinion in this case as well as in the majority opinion

in *Gardner v. State,* supra and in the concurring opinion in *McGlohon v. State,* supra are contrary to *Jackson v. State*, 265 Ga. 897, 898 (2) (463 SE2d 699), in which our Supreme Court held that *Purkett* requires trial courts to apply the three-part test to *Batson* challenges. Additionally, I believe that this theory is contrary to the considerable body of law that has developed in this area. See, e.g., *Turner v. State*, 267 Ga. 149 (476 SE2d 252); *Chandler v. State*, 266 Ga. 509 (467 SE2d 562); *McKenzie v. State*, 227 Ga. App. 778 (490 SE2d 522); *O'Neal v. State*, 226 Ga. App. 224 (482 SE2d 478) (physical precedent). Thus, as we are bound to follow *Jackson*, we cannot adopt Judge Eldridge's views on this issue even though they are helpful in analyzing the appellate considerations applicable in a *Batson/McCollum* challenge. Therefore, if I could now do so, I would withdraw my full concurrence in *Gardner*.

ELDRIDGE, Judge, concurring specially.
As to Division 2, I concur in judgment only.
1. The majority states: "a trial court must employ the three-step burden shifting inquiry announced in *Purkett v. Elem,* 514 U. S. 765 (115 SC 1769, 131 LE2d 834) (1995)." I cannot agree. A trial court does not engage in the analysis announced in *Purkett* and which formed the basis for reversal in that decision.

As I explained in *Gardner v. State*, have stressed repeatedly thereafter, and will continue to stress: *The Purkett analysis does not apply to the trial court.*[1] *Purkett* applies to appellate analysis: "The *Court of Appeals* erred by combining *Batson*'s second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive [to the Court of Appeals]." (Emphasis supplied.) *Purkett* at 839; compare *Jackson v. State*, 265 Ga. 897, 899 (463 SE2d 699) (1995).

In *Purkett*, the Eighth Circuit Court of Appeals conducted a de novo review of the step 2 reasons for striking, found the reasons "silly," and reversed the trial court's step 3 determination that the reasons were sound. The United States Supreme Court admonished the Eighth Circuit Court of Appeals to keep its appellate "hands off" the trial court's step 3 credibility determinations: "[T]o say that a *trial* judge *may choose to disbelieve* a silly or superstitious reason at step 3 is quite different from [the Eighth Circuit] saying that a trial judge *must terminate* the inquiry at step 2 when the race-neutral reason is silly or superstitious." (Emphasis in original and supplied.) Id. at 839. In plain language: a trial judge *may* choose to disbelieve a

---

[1] 225 Ga. App. 427 (483 SE2d 912) (1997): a case whose length apparently precluded worth; see also *McGlohon v. State*, 228 Ga. App 726 (492 SE2d 715) (1997) (Eldridge, J., concurring specially).

silly reason, but he does not *have* to, and an appellate court cannot make him just because the appellate court finds the reason silly.

The *Purkett* bottom line: In a *Batson/McCollum* review, the *appellate* courts cannot use step 2 reasons which are race-neutral on their face in order to reverse a trial court's step 3 credibility decision.[2]

2. The majority states: "Indeed, this same problem [failure to determine explanations' race-neutrality before persuasiveness] resulted in a reversal in *Purkett* and was the subject of much of the dissent's opinion in that case. (Cit.)" *Purkett* did not reverse a *trial court* on this basis.

*Purkett* was reversed because the *appellate* court (not the trial court) "combined" steps 2 and 3 by analyzing, de novo, the step 2 reasons for striking, instead of deferring to the trial court's step 3 determination that the reasons were acceptable. The race-neutral reasons, themselves, obviously provided no basis for reversing a trial court's decision to believe them.

3. In *Purkett* at the *trial* level, the *Batson* procedure went as follows: explanations were offered under step 2; and immediately thereafter, the trial court, *without explanation* (as in this case), overruled respondent's objection and empaneled the jury under step 3.[3] Id. at 838. That was all. And neither the Eighth Circuit Court of Appeals nor the United States Supreme Court disapproved of or attempted to alter, expand, or illuminate this *trial* procedure. The entire *Purkett* opinion was directed to *appellate* errors in evaluating this proper trial procedure.

Accordingly, what can be gleaned from the procedural posture of *Purkett* at the *trial* level (and the fact that such procedure was left alone by the appellate courts) is that:

(a) A trial court is *not* required to "specifically rule on the racial neutrality of [the proffered] explanations" as urged by the majority.

(b) A trial court is *not* required to first "deem[ ] race neutral" a reason that it has determined to be pretext, as has been held in *Pickett v. State*, 226 Ga. App. 743, 745-746 (487 SE2d 653) (1997); *Leeks v. State,* 226 Ga. App. 227, 229 (483 SE2d 691) (1997); and *O'Neal v.*

---

[2] In a *McCollum* appeal, such as in this case, the race-neutral aspect of the reasons provides no basis for reversal, because the trial court does *not* believe the explanations *despite* their race-neutral cast. The trial court's step 3 credibility determination is then based upon factors *other* than the facially race-neutral reasons. Thus, the appellate inquiry in a *McCollum* claim is the mirror image of that of a *Batson* claim: whether anything in the record demonstrates that the trial court was clearly in error for *dis*believing the race-neutral reasons.

[3] In *Purkett*, as in this case, the prosecutor offered explanation for his use of strikes following the initial objection, and a step 1 prima facie showing was not made. See, e.g., *Lewis v. State*, 262 Ga. 679, 680 (2) (424 SE2d 626) (1993).

*State,* 226 Ga. App. 224, 225-226 (482 SE2d 478) (1997).

(c) A trial court is *not* required to first hear "rebuttal" of the explanations from the opponent of the strike as part of and prior to its step 3 determination as has been held in *Gilbert v. State,* 226 Ga. App. 230, 232 (486 SE2d 48) (1997).

(d) A trial court is *not* required to accept any reason as long as it is race-neutral on its face, as has been found in *Malone v. State,* 225 Ga. App. 315, 317-319 (484 SE2d 6) (1997), and *Leeks,* supra at 229; cf. *McKenzie v. State,* 227 Ga. App. 778 (490 SE2d 522) (1997).

(e) The record is *not* required to "show that the trial court considered each step of the three-step process separately" as has been held in *Smith v. State,* 229 Ga. App. 765 (494 SE2d 757) (1997), and *Malone,* supra at 318-319.

4. Our appellate interpretations of *Purkett* have had the effect of overruling *Batson/McCollum* in Georgia. Candidly, since our Supreme Court's opinion in *Jackson,* which, in dicta, first applied the *Purkett* decision to the trial courts, as opposed to the appellate courts, *Baston/McCollum* jurisprudence in this State has been in turmoil. Language from *Purkett* such as "the second step does not demand an explanation that is persuasive or even plausible," has been repeatedly applied in a direct appellate review of step 2, rather than in recognition of the correctness of the trial court's *Batson* step 3 decision, as intended by *Purkett.* Trial courts are regularly being reversed by this Court on the basis of language in *Purkett* that was never meant to apply to the trial court's *Batson* procedures. In short, we are engaging in the same errors in appellate analysis as did the Eighth Circuit Court of Appeals in *Purkett.*

A review of recent decisions from this Court makes it very clear that explicit guidance from our Supreme Court is needed on this issue, and very soon, in order to ensure that *Batson* and *McCollum* remain viable. Physician, heal thyself; otherwise, the evil against which *Batson* and *McCollum* were designed to protect, discrimination in the use of peremptory strikes, is back, in force, in Georgia.

DECIDED FEBRUARY 17, 1998 ▬▬▬▬

*Robert S. Devins,* for appellant.

*Thomas J. Charron, District Attorney, Ann B. Harris, Debra H. Bernes, Nancy I. Jordan, Assistant District Attorneys,* for appellee.