301 Ga. 720
FINAL COPY

S17A0818. COLEMAN v. THE STATE.
S17A0819. MALLORY v. THE STATE.

BLACKWELL, Justice.

Horace Coleman and Quantez Mallory were tried jointly by a Douglas County jury and convicted of malice murder in connection with the beating death of Bobby Tillman. Coleman and Mallory each filed separate appeals, which we consolidate for purposes of this opinion. Coleman contends that the trial court erred when it denied his motion for a mistrial after the prosecution elicited purportedly inadmissible testimony from a jailhouse informant. Mallory argues that the trial court erred when it denied his Batson[1] challenge during jury selection and that his due process rights were violated because he lacked access to prospective jurors' criminal histories maintained by the Georgia Crime Information Center ("GCIC"). Both Coleman and Mallory also contend that the

---

[1] Batson v. Kentucky, 476 U. S. 79, 89 (II) (B) (106 SCt 1712, 90 LE2d 69) (1986) ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . .").

trial court's questioning of the State's forensic pathologist constituted an erroneous comment on the evidence. Upon our review of the record and briefs, we see no error, and we affirm.[2]

1. Viewed in the light most favorable to the verdict, the evidence presented at trial shows the following. Two high-school-age sisters decided to have a small gathering with their mother's permission. The girls invited approximately 12 friends (including Tillman) to their house in Douglasville, but news of the party spread on social media, and more than 100 people showed up. Coleman and Mallory were among the many individuals who came to the party uninvited. Due to the oversized crowd, the girls' mother and her boyfriend called the police and told everyone to leave the premises. As people left the

---

[2] The crime occurred on November 6, 2010. A Douglas County grand jury indicted Coleman and Mallory (along with co-defendants Emmanuel Boykins and Tracen Franklin) for malice murder (Count 1) and felony murder (Count 2) on November 19, 2010. Coleman and Mallory jointly stood trial from January 14 to January 25, 2013, and a jury found each guilty of malice murder (but did not return a verdict on the felony murder count). (Boykins had earlier pleaded guilty, and Franklin was tried separately and convicted.) The trial court sentenced Coleman and Mallory to life without the possibility of parole. Coleman filed his motion for new trial on February 6, 2013, and his amended motion for new trial on July 13, 2015, and the trial court denied the motion on April 14, 2016. Mallory filed his motion for new trial on February 6, 2013, amended the motion on February 23, 2016, and the trial court denied the motion on April 13, 2016. Mallory and Coleman timely filed their notices of appeal on April 25 and May 3, 2016, respectively. Their cases were docketed in this Court for the term beginning in April 2017.

house, crowds congregated outside and spilled onto the street. Soon, fights broke out among some of the girls at the party. Emmanuel Boykins (who was later also indicted) tried to break up one of the fights and was hit. He was overheard saying he did not want to retaliate against a female, but instead was going to hit the first man he saw.

Meanwhile, Tillman was passively standing by a car, across the street from the house. Boykins ran up to Tillman and began punching him. Almost immediately, Coleman, Mallory, and Franklin joined in the attack. When Tillman fell to the ground, the attackers kicked him in the chest and stomped on him multiple times. The beating continued even as some of the bystanders attempted to pull the attackers off Tillman. When the attackers stopped, Tillman was shaking and foaming at the mouth. He was unresponsive when the paramedics arrived and was pronounced dead shortly after arriving at the hospital.

When the police came to the scene, they rounded up the partygoers, boarded them onto a bus, and took them to a police station for questioning. Eyewitnesses identified the attackers by their appearance. Coleman was described as an attacker who had dreadlocks with gold or yellow tips and who

wore a green hoodie, a blue hat, and two or more rosary necklaces. Mallory was described as having a "fade" or "box" haircut and wearing a white jacket with red stripes down the sleeves. Both Coleman and Mallory were also identified as the perpetrators via photographic lineups. An autopsy revealed that the ultimate cause of Tillman's death was laceration of the heart caused by a blunt impact to the chest.

2. Coleman and Mallory do not dispute that the evidence was sufficient to sustain their convictions for malice murder. Nevertheless, as is our customary practice in murder cases, we independently have reviewed the record with an eye toward the legal sufficiency of the evidence. We conclude that the evidence presented at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Coleman and Mallory each was guilty of malice murder. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

3. Coleman argues on appeal that the trial court erred when it denied his motion for a mistrial after the prosecution elicited purportedly inadmissible hearsay testimony from a jailhouse informant. The record reflects that the prosecutor asked the informant whether he had encountered any trouble in jail

4

as a result of his agreement to testify, upon which the informant responded: "I've had people say that [Coleman] wanted them to come beat me up because I got him some time." The informant also stated that he was involved in a fight where someone said "this is for [Coleman]." The trial court sustained a hearsay objection to this testimony but refused to grant Coleman's request for a mistrial, opting instead to give a limiting instruction to the jury and rebuke the prosecution.

Assuming that the informant's testimony was indeed inadmissible, we see no error in the trial court's refusal to grant a mistrial. "Whether to declare a mistrial is a question committed to the discretion of the trial judge, and the denial of a mistrial is reversible error only if it appears that a mistrial was essential to preserve the defendant's right to a fair trial." McKibbins v. State, 293 Ga. 843, 848 (3) (750 SE2d 314) (2013) (citation and punctuation omitted). Here, a mistrial was not necessary to preserve Coleman's right to a fair trial. Almost immediately after the informant uttered the offending statements, the trial court conferred with the parties and then gave a lengthy curative instruction to the jury, telling the jurors that the informant's testimony was inadmissible, that it did not prove that Coleman had done anything, and that they should

5

"disregard that evidence in its entirety, not hold it against Mr. Coleman in any way, [and] not weigh it or consider it in any manner in your deliberations in this case." We ordinarily presume that a jury follows such instructions. <u>Adams v. State</u>, 274 Ga. 854, 855 (2) (561 SE2d 101) (2002).

Not only did the trial court give curative instructions, but it also rebuked the prosecution in front of the jury, stating: "I'm rebuking the state in your presence, and telling them they are not to go into this. It was inappropriate for the state to ask a question that resulted in that answer being given." In this light, any harm stemming from the informant's purportedly inadmissible statements was substantially mitigated, and the trial court did not abuse its discretion in refusing to grant a mistrial.[3] See <u>McKibbins</u>, 293 Ga. at 850 (3) (c) (trial court did not abuse its discretion when it denied a mistrial after improper statement

---

[3] We further note that Coleman thoroughly cross-examined the informant and brought out his seven prior convictions, including convictions for giving false information to law enforcement officers and financial transaction card fraud. The defense further brought out the fact that the informant was currently facing charges for theft by deception and financial transaction card fraud. The jury would have had ample reason to discredit the informant's testimony.

by prosecutor, "especially because the trial court promptly admonished the prosecuting attorney and told the jury to disregard the statement").[4]

4. Mallory contends that, during jury selection, the trial court erred by rejecting his <u>Batson</u> challenge to the prosecutor's peremptory strikes of black potential jurors. The resolution of a <u>Batson</u> challenge at the trial court level involves three steps: "(1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven the proponent's discriminatory intent." <u>Toomer v. State</u>, 292 Ga. 49, 52 (2) (a) (734 SE2d 333) (2012) (citation and punctuation omitted). At the second step, all that is required is for the proponent of the strike to provide a *facially* race-neutral explanation for the strike; this explanation need not be "persuasive, or even plausible." Id. at 54 (2) (b). It is only at the third step that the trial court "makes credibility determinations, evaluates the persuasiveness of the strike opponent's prima facie

---

[4] Because we conclude that the trial court did not abuse its discretion when it refused to grant a mistrial, we do not address the State's argument that Coleman failed to preserve the issue by not renewing his motion for a mistrial in a timely manner after the court's curative instructions. We also do not address Coleman's suggestion that his counsel was ineffective for failure to timely renew the mistrial motion.

7

showing and the explanations given by the strike proponent, and examines all other circumstances that bear upon the issue of racial animosity." Heard v. State, 295 Ga. 559, 567 (3) (761 SE2d 314) (2014) (citation and punctuation omitted). "A trial court's finding as to whether the opponent of a peremptory strike has proven discriminatory intent is entitled to great deference and will not be overturned unless clearly erroneous." Younger v. State, 288 Ga. 195, 198 (2) (702 SE2d 183) (2010).

Mallory specifically contends that the trial court erred at the third step of Batson because it failed to make an express finding as to whether purposeful discrimination was shown.[5] We are unpersuaded. A careful review of the record reveals that the trial court did not simply stop at step two of the Batson inquiry, but implicitly engaged in the third step. For each of the six black jurors struck from the venire, the prosecution gave an ostensibly race-neutral explanation for

[5] Notably, Mallory does not expressly argue on appeal that the State actually struck any jurors based on race; the heart of his argument is that the trial court committed a procedural error by failing to make an express finding on the third step of the Batson inquiry. Our review of the record likewise does not reveal any discriminatory intent on the part of the prosecution. Indeed, as the trial court noted, the State accepted at least three black jurors, and while "the presence of African-American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim." United States v. Edouard, 485 F3d 1324, 1343 (II) (B) (11th Cir. 2007) (citation and punctuation omitted).

8

the strike, which completed the second <u>Batson</u> step. The trial court then heard arguments from the defense about why the prosecutor's explanation was inadequate as to each juror. After hearing from both the prosecution and the defense, the trial court made its own findings (for each juror separately) about why it believed the prosecution's explanation was "race neutral," citing its own observations of the voir dire process and the jurors' demeanor. Only after hearing from both sides and laying out its own findings on the matter did the trial court deny the <u>Batson</u> challenge as to each juror. Thus, although the trial court used the term "race neutral" in its ultimate findings – a term usually employed in connection with the second <u>Batson</u> step – the record indicates that the court in fact assessed the totality of the circumstances and found no discriminatory intent in the State's use of peremptory strikes, thereby completing the <u>Batson</u> inquiry.[6] Indeed, in the order denying Mallory's motion for a new trial, the same trial judge who presided over the jury selection stated: "[T]he court finds now, as it did then, that . . . there was no discriminatory intent on the part of the prosecution in jury selection[.]" We discern no clear error in

_____

[6] We note that, with respect to the last stricken juror, the trial court did expressly address step three of <u>Batson</u>, stating that the prosecution's "explanation is race-neutral, and I'm not going to find there was any discriminatory intent."

9

this ruling. See Heard, 295 Ga. at 567 (3) (finding no clear error where the trial court denied defendant's Batson challenge "[a]fter finding that the State provided facially race-neutral reasons for the strikes"); Wilburn v. State, 230 Ga. App. 619, 623 (497 SE2d 380) (1998) ("[A]lthough a clearer record would allow us to rely less on implication and more on the actual findings of the trial court, based on this unclear record we cannot conclude that the trial court *clearly erred* in reseating the stricken jurors."); see also United States v. Edouard, 485 F3d 1324, 1343 (II) (B) (11th Cir. 2007) (upholding trial court's denial of a Batson challenge even though trial court improperly condensed the second and third steps of Batson inquiry).[7]

5. We next consider the argument that Mallory was entitled as a matter of due process to the GCIC records of prospective jurors. To begin, we note that Mallory never requested such records under OCGA § 35-3-34, which provides

---

[7] We caution that steps two and three of Batson are distinct inquiries, and combining them may lead to impermissible burden-shifting. See Purkett v. Elem, 514 U. S. 765, 768 (115 SCt 1769, 131 LE2d 834) (1995) ("[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."); Jackson v. State, 265 Ga. 897, 899 (2) (463 SE2d 699) (1995). As our Court of Appeals has noted, the trial court must not only utilize the three-step analysis, "but should also clearly state on the record its reasoning and conclusions as to *each step* of the inquiry." Wilburn, 230 Ga. App. at 623 (2) (emphasis supplied).

a means by which private persons (including defense lawyers) may request and (in some circumstances) obtain GCIC records. See OCGA § 35-3-34 (a) (1) (A) ("Private individuals and businesses requesting criminal history records shall, at the time of the request, provide the fingerprints of the person whose records are requested or provide a signed consent of the person whose records are requested on a form prescribed by [GCIC]."). See also Williams v. State, 255 Ga. App. 177, 177 (1) (a) (564 SE2d 759) (2002). Mallory also never challenged the constitutionality of OCGA § 35-3-34 in the trial court, and he has failed, therefore, to preserve any question about its constitutionality for our review. See Bell v. State, 293 Ga. 683, 684 (2) (748 SE2d 382) (2013) ("[B]ecause the trial court never ruled on the constitutionality of [the statute] below, [defendant] has presented nothing for this Court to review on appeal."). Because OCGA § 35-3-34 provides a means by which Mallory might have sought to obtain GCIC records — but because he failed to request records under the statute or to challenge the statute as constitutionally inadequate — his claim that his lack of access to such records violated due process is not viable.

Moreover, Mallory raised his lack of access to GCIC records in the context of his Batson challenge, after the prosecution used the GCIC records of

11

one prospective juror to support its reasons for striking that juror. Mallory does not explain how having the GCIC records of prospective jurors would have helped him in jury selection generally, aside from the conclusory assertion that a lack of those records "impeded [him] in the exercise of his strikes," nor does he explain how having such records would have enabled him to prevail on his Batson challenge. Although Mallory argues that GCIC records often contain inaccuracies, he does not explain how any such inaccuracies undermined his Batson challenge, given that Batson is only about *racial discrimination* – it does not prevent the prosecution from relying on inaccurate (but race-neutral) information in striking jurors. See Toomer, 292 Ga. at 52 (2) (a), (b).

In any event, we have previously stated that a defendant is not entitled to "discover directly the information obtained by the State in preparing for its jury selection." Williams v. State, 271 Ga. 323, 324 (2) (519 SE2d 232) (1999) (holding that Batson did not entitle defendant to question the prosecutor and law enforcement officers about investigatory information on which the State based its peremptory challenges). And it is well settled that "there is no general constitutional right to discovery in a criminal case." Bello v. State, 300 Ga. 682, 683 (1) (797 SE2d 882) (2017) (citation and punctuation omitted). Thus, no due

12

process violation occurred merely because the State had access to certain information during jury selection that the defense did not.[8]

6. Both Coleman and Mallory argue that the trial court improperly commented on the evidence by extensively questioning the State's forensic pathologist, Dr. Jonathan Eisenstat, about Tillman's death. At trial, after both parties examined Dr. Eisenstat, the trial court asked him a series of questions relating to (1) how the position of the victim (e.g., standing or lying down) affected the force of the impact on the body; (2) whether Tillman was lying down at the time of impact, and whether he was lying sideways or flat on his chest or back; (3) whether the force applied to Tillman consisted of kicking or stomping, or both; and (4) whether the victim's size affected the severity of the injury. In answering these questions, Dr. Eisenstat testified, essentially, (a) that the force applied to the body will be greater if the individual is lying down or standing up against the wall than if he has room to fall back; (b) that Tillman was probably lying down, either on his back or on his chest, during the attack;

---

[8] Of course, "[t]he constitutional guarantee of due process does require the State to turn over evidence in its possession that is material to guilt or punishment and is favorable to the accused." Bello, 300 Ga. at 683 (1) n.3 (citing Brady v. Maryland, 373 U. S. 83, 87 (83 SCt 1194, 10 LE2d 215) (1963)). But this type of exculpatory information is not at issue in this appeal.

13

(c) that Tillman was more likely stomped on than kicked, as the force from stomping is greater; and (d) that Tillman's relatively small size — 5′7″, 128 pounds — likely resulted in greater injuries than if he had been taller and more massive. Neither Mallory nor Coleman objected to the court's questioning.

At the time of trial, OCGA § 17-8-57 provided: "It is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused."[9] Aside from this narrow prohibition, a trial court has discretion to "propound questions to a witness to develop the truth of the case, to clarify testimony, to comment on pertinent evidentiary rules and to exercise its discretion when controlling the conduct of counsel or witnesses in order to enforce its duty to ensure a fair trial to both sides." Curry v. State, 283 Ga. 99, 102 (4) (657 SE2d 218) (2008) (citation and punctuation omitted).

A review of the transcript of Dr. Eisenstat's testimony reveals that the trial court did not express or intimate any opinion as to the evidence or the guilt of

---

[9] This provision was slightly amended in 2015 to state: "It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused." OCGA § 17-8-57 (a) (1) (2015).

14

either defendant. The court's questions were "entirely objective" and "did not suggest any particular answer to the witness." See <u>Curry</u>, 283 Ga. at 101-102 (trial court did not improperly express opinion when it questioned firearm expert about the type of firearm used in the crime, whether defendant fired hollow-point or solid-point bullets, and the difference between those types of bullets). Moreover, the trial court's questions to Dr. Eisenstat related solely to the manner and cause of Tillman's death — issues that were not in dispute at trial. The main question before the jury was *who* perpetrated the murder, not *how* the crime was committed. Accordingly, the trial court acted within its discretion in questioning Dr. Eisenstat.[10]

<u>Judgments affirmed. All the Justices concur</u>.

---

[10] Under the prior version of OCGA § 17-8-57, a trial judge's violation of the statute required automatic reversal, even if the defendant failed to object. Under the amended version, which was enacted only after Coleman and Mallory's trial, a failure to object warrants review only for plain error (unless the trial judge expresses an opinion "as to the guilt of the accused," in which case reversal is still automatic). OCGA § 17-8-57 (b), (c). Because we conclude that the trial court did not err when it questioned Dr. Eisenstat, we do not reach the issue – raised by the parties – of whether the new statutory standard applies in this case. See <u>Pyatt v. State</u>, 298 Ga. 742, 747 (3) n.9 (784 SE2d 759) (2016).

Decided August 14, 2017.

Murder. Douglas Superior Court. Before Judge McClain.

Miller & Key, J. Scott Key, for appellant (case no. S17A0818).

Stephen R. Scarborough, for appellant (case no. S17A0819).

Brian K. Fortner, District Attorney, Emily K. Richardson, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, S. Taylor Johnston, Aimee F. Sobhani, Assistant Attorneys General, for appellee.