**SECOND DIVISION**
**MILLER, P. J.,**
**RICKMAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**April 30, 2019**

# In the Court of Appeals of Georgia

A19A0340. EARWOOD v. THE STATE.

RICKMAN, Judge.

Following a jury trial, Patrick Edward Earwood, a police officer, was convicted of several felonies based upon his predatory criminal conduct while on duty. He filed a motion for new trial, which the trial court denied.[1] Earwood appeals the judgment of conviction and the trial court's subsequent denial of his motion for new trial. Specifically, he argues that the trial court erred in denying his motion for a mistrial after a State witness referenced bad character evidence that he contends had been excluded pursuant to a motion in limine, and further erred in preventing him from

---

[1] The trial court originally denied Earwood's motion for new trial as time barred; however, this Court reversed the trial court's dismissal order and upon remand, the trial court denied the motion on its merits.

refreshing a witness's recollection with a report written by a third party. We find no error and affirm.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to support the jury's verdict, and the defendant no longer enjoys a presumption of innocence. We do not weigh the evidence or judge the credibility of the witnesses, but determine only whether the evidence authorized the jury to find the defendant guilty of the crimes beyond a reasonable doubt in accordance with the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LEd2d 560) (1979).

*Laster v. State*, 340 Ga. App. 96, 97 (796 SE2d 484) (2017).

So construed, the evidence adduced at trial showed that in May 2012, Earwood was sworn in as a police officer and began working part-time for the Cave Spring Police Department (the "Department"). The Department was small and was made up of mostly part-time officers, although it employed three full-time officers. A single officer was assigned to work any given 12-hour shift, and that officer generally drove the newer of the two police vehicles owned by the Department. In mid-2013, Earwood became one of the three full-time officers.

In June 2013, an investigator with the Floyd County Police Department was given information that a child had alleged inappropriate conduct against an officer

within the Department and she began to investigate. During the ensuing investigation, the investigator discovered several young women who made allegations of misconduct against Earwood:

(a) B. B., who was between 14 and 15 years old at the time, alleged that during the summer of 2012, she was in Cave Spring living with a friend after finishing her ninth grade school year. At approximately 9:00 p.m. one summer evening, B. B. was in the park getting some water while walking to a nearby friend's house. Earwood drove by B. B. in his patrol car before circling back around and inquiring what she was doing in the park. He then demanded that she give him oral sex and threatened that he would arrest her mother for neglect if she refused to do so. B. B. complied with Earwood's demand as he stood outside of the patrol car.

B. B. also reported that on several occasions, Earwood drove her and her friends around in his patrol car late at night after curfew, taking them swimming or allowing them into otherwise closed government buildings to go "ghost hunting." On one such occasion, B. B. and her friend, M. R., were walking to M. R.'s boyfriend's house when Earwood passed in his patrol car and picked them up. Earwood let the girls into City Hall to "ghost hunt[ ]" and then allowed them to climb over the fence into the closed public pool to swim. After encouraging the girls to swim naked, which

3

they declined to do, Earwood shined a flashlight on them as they changed. He then left the girls, who proceeded to walk to M. R.'s boyfriend's house. At some point, the girls got into an argument and B. B. left. While walking home alone, Earwood again stopped B. B., who asked him to retrieve M. R. from her boyfriend's house. Earwood agreed on the condition that B. B. "flash" him.

(b) M. R., who was between 15 and 16 years old at the time, confirmed the events above and explained that after "ghost hunting" and swimming with B. B., Earwood did indeed retrieve her from her boyfriend's house, telling her that she "needed to go with him because he's a cop." M. R. originally sat in the back of the patrol car, but Earwood stopped the vehicle and removed his belongings from the front seat so that M. R. would join him there. While doing so, Earwood asked M. R. to pull up her shirt, but she refused. He thereafter drove M. R. to numerous isolated locations, including the cemetery, where he turned off all the lights and told her it "would be more fun if [she] would be willing to do stuff." He then took her to a dead-end road and asked her to "do it on the hood" of the patrol car. After M. R. shook her head "no," Earwood began rubbing her upper thigh and attempted to put his hand down her pants, but she pushed his hand away. He also squeezed her breast and attempted to put his hand under her shirt, but she again pushed his hand away. Before

4

departing, Earwood asked if she would "lean down and do anything to him." M. R. indicated that she would not and seeking a distraction, began calling and texting her boyfriend.

M. R. eventually told Earwood that she needed to use the restroom, and that her blood sugar was low and she needed food. He took her to City Hall and before going inside, M. R. called her father and let him know she was with Earwood; the two men also spoke. As M. R. finished using the bathroom and began pulling up her pants, Earwood appeared and told her "you can pull [those] back down." M. R. nervously laughed it off, and Earwood took her to a gas station to buy a candy bar before he again drove them to the dead-end road. M. R. informed Earwood that B. B. was texting her and eager for her to return, and Earwood responded that she "would [have been] a whole lot more fun if [she] would have stayed . . . off the phone." Earwood eventually returned M. R. to her boyfriend's house where B. B. was waiting, after confirming that she would not "tell anybody . . . anything about tonight."

M. R., B. B., and M. R.'s boyfriend discussed the events that night between the three of them, but no one reported Earwood's conduct until June 2013, when M. R. disclosed it to a friend whose father was also an officer within the Department. It was

M. R.'s outcry and the subsequent reporting of that outcry to her friend's law enforcement father that prompted the investigation in this case.

(c) A. G. was another of Earwood's victims. In May 2013, A. G., who was not from Cave Spring, drove there with a friend. She was under the influence of prescription drugs and methamphetamine when she and her friend got into an argument outside of an apartment complex, and her friend drove away and left her there. Knowing nobody in the city, A. G. began walking up the road when she was stopped by an off-duty police officer who had witnessed the events. The officer instructed A. G. to wait for a uniformed officer to arrive, and although she initially attempted to resist the officer's request, she ultimately relented.

Earwood arrived in a marked police vehicle and the off-duty officer left. After obtaining A. G.'s preliminary information, Earwood requested and obtained consent to search her person, at which time he found narcotics in her pocket. At no point, however, did Earwood use his radio or formally arrest A. G. Rather, he drove her to the police station while repeatedly asking, "[W]ell, what are we gong to do about this?" After what A. G. perceived to be an extensive amount of time, she and Earwood were still sitting in the police station, alone, while he made small talk and ignored her repeated inquiries as to whether he was going to arrest her. Finally, A. G.

6

called her mother to ask for money, assuming that Earwood was seeking payment to let her go.

Ultimately, Earwood demanded oral sex in exchange for releasing A. G. She agreed, on the condition that he drive her to meet her mother when she was finished. Earwood drove to a remote dirt rode and stood beside his vehicle as A. G. performed oral sex on him. He then took A. G. to a store located in a different city, where her parents had been waiting for several hours in the parking lot. After departing, A. G. "just sat in the backseat and cried."

The following day, A. G. was despondent and went to visit a friend, to whom she proceeded to tearfully relay that a Cave Spring police officer had forced her to "do something [sexual] she didn't want to do." Unbeknownst to A. G., her friend was engaged as a confidential informant in a reverse sting operation with the Polk County Drug Task Force, and law enforcement officers were on the property surveilling their conversation. Those officers reported A. G.'s allegations to the Floyd County Drug Task Force, where the information was ultimately given to the investigator who was already probing the allegations of criminal misconduct lodged by B. B. and M. R.

In the end, Earwood was arrested, tried, and convicted of aggravated child molestation, aggravated sodomy,[2] child molestation, two counts of cruelty to children in the second degree, sexual battery, sexual assault against a person in custody, giving false statements, and violation of oath by a public officer for his conduct involving the three victims.[3] This appeal follows the trial court's substantive denial of his motion for new trial.

1. Earwood argues that the trial court erred in denying his motion for mistrial after a State witness referenced uncharged sexual activity allegedly engaged in by Earwood in the Department vehicle. We disagree.

Prior to trial, Earwood filed a vague motion in limine to exclude "uncharged misconduct," but did not otherwise identify specific acts he sought to exclude. At the hearing on the motion, the prosecutor noted that she was "not sure what [Earwood was] referring to," but noted that the State "[was not] planning on introducing any

---

[2] Earwood was charged with and found guilty of a second count of aggravated sodomy, but that count merged into his aggravated child molestation conviction for sentencing purposes.

[3] Earwood was also charged with sexual assault and sexual battery against a fourth victim, but he was acquitted of those charges at trial.

uncharged conduct." The parties then proceeded without invoking a ruling from the trial court.

During the trial, the investigator readily admitted that she did not conduct a forensic examination of the Department vehicle used by Earwood until nearly a year after allegations against him first surfaced, and that she otherwise did not take any DNA samples from the interior of the vehicle. Earwood's counsel engaged the investigator in extensive cross-examination, during which she explained that, among other things, Earwood's DNA inside the vehicle would not have corroborated the victims' allegations because the sexual conduct they described occurred outside of the vehicle. Defense counsel nevertheless continued to press the issue by asking repeated questions about her failure to search the vehicle for physical evidence. The investigator eventually responded, "There's other people. Do you want to go there? There's other people that had sex with [Earwood] in that car."

Earwood's counsel immediately moved for a mistrial and questioned the investigator outside of the presence of the jury. The investigator stated that she had received reports from third-parties that Earwood had engaged in consensual sexual relations with other women in the vehicle, but she did not provide that evidence to the State because one account came from the aunt of a visiting woman who had "a

summertime fling" with Earwood, and another involved a women who steadfastly denied the affair and told the investigator she would deny it at trial.

Earwood accused the investigator of misconduct and renewed his motion for a mistrial, which the trial court denied. The trial court did, however, give the following curative instruction:

> The testimony that was elicited at the end of [the investigator's] testimony . . . [when] she talked about other sexual relations in the car . . . I struck that testimony. I don't know if you understand what that means. . . That means . . . there's no evidence of that. There's no evidence for us to consider. It wouldn't be relevant to this trial at all. And so you are to totally strike it from your mind. . . . [Y]ou need to be able to understand that if you wrote it in your notes, you strike through it. You forget it. It's not part of the case. It's not allowed to be admitted into the case. It's not something that you are allowed to consider.

The trial court then confirmed by a showing of hands that each of the jurors would follow that instruction. Earwood renewed his motion for mistrial after the curative instruction was given.

Earwood now argues that the investigator's statement impermissibly injected his character into issue and violated the trial court's ruling on his motion in limine, which sought to exclude uncharged misconduct. As set forth above, however, the trial

10

court never ruled on Earwood's motion in limine and, consequently, there was no ruling to violate. See *Zehner v. State*, 241 Ga. App. 345, 345 (2) (525 SE2d 416) (1999) ("The failure to invoke a ruling on a motion in limine results in a waiver of the motion.").

Regardless, even assuming the testimony was improper, the trial court's refusal to grant a mistrial after its admission was not reversible error. "[T]he decision to grant a motion for mistrial lies within the trial court's sound discretion, and the trial court's exercise of that discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." (Citation and punctuation omitted.) *Jordan v. State*, ___ Ga. ___, ___(2) (823 SE2d 336) (2019).

The investigator here readily admitted that months had passed before she conducted a forensic examination of the vehicle and that she never searched for DNA evidence; nevertheless, defense counsel continued to attack her investigation techniques and challenge her various explanations as to why she did not believe that physical evidence obtained from the vehicle would substantiate the victims' claims. It was only after repeated questioning on the same issue that the investigator ultimately offered the challenged explanation, and Earwood cannot now be heard to complain about the answer that he extracted. See *Buxton v. State*, 253 Ga. 137, 139

11

(3) (317 SE2d 538) (1984) ("Trial counsel may not take chances in propounding questions which may elicit damaging answers and then demand a mistrial on the basis of the answer."); *Gorman v. State*, 318 Ga. App. 535, 539-540 (3) (734 SE2d 263) (2012) (same).

Moreover, the trial court gave the jury a prompt and thorough curative instruction to disregard the statement. "We ordinarily presume that a jury follows such instructions," *Coleman v. State*, 301 Ga. 720, 722 (3) (804 SE2d 24) (2017), although in this case we need not rely on that presumption because the trial court confirmed the same through a showing of hands from the jurors. Consequently, Earwood has failed to show that a mistrial was essential to preserve his right to a fair trial, and the trial court did not abuse its discretion in denying his motion. See *Jordan*, __ Ga. at ___ (2).

2. Earwood next argues that the trial court erred in refusing to allow him to refresh a witness's recollection with a report written by a third-party. Again, we disagree.

During its case-in-chief, the State called as a witness M. R.'s friend to whom M. R. made her initial outcry. The friend testified that M. R. told her that Earwood had "touched her inappropriately," and that she then reported M. R.'s allegation to her

12

law enforcement father. During cross-examination, Earwood's counsel engaged in the following colloquy with M. R.'s friend:

Q: Were you present when your dad spoke directly with [M. R.] about these things?

A: Yes, sir.

Q: Okay. And have you had a chance to see his report on that?

A: No, sir.

Q: Are you aware that what [your father] reported was that [M. R.] said that [Earwood] never touched her?

A: No.

Q: Would it refresh your memory to look at his report?

A: I guess.

The State objected to counsel's use of the report. During the ensuing bench conference, the parties discussed the report, which was allegedly written by the police chief after receiving a telephone call from the friend's father, who relayed to him M. R.'s allegations. The trial court refused to allow Earwood to use the report.

Earwood contends that the report was admissible and that the trial court erred in disallowing his use of the report to "refresh [the] witness'[s] recollection."

13

As an initial matter, however, the subject report is not contained in the appellate record.[4] "The burden is on the party alleging error to show it affirmatively by the record. This [C]ourt cannot determine the propriety of the trial court's ruling without a proffer of the excluded evidence or testimony." (Citation and punctuation omitted.) *Fletcher v. Estes*, 268 Ga. App. 596, 597 (1) (602 SE2d 164) (2004); see also *Dent v. Candler Hospital, Inc.*, 236 Ga. App. 540, 541 (2) (512 SE2d 392) (1999).

Regardless, when asked about the report, M. R.'s friend testified that she had not seen the document, nor was she aware of its alleged contents. Further, at no time did she purport to have a faulty memory or express a need to have it refreshed, particularly by a document that she could not identify and that was not prepared by her, for her, or from information provided by her. Under these circumstances, it was not error for the trial court to preclude Earwood's counsel from reading from the document and questioning the witness about its contents. See generally *Zilinmon v. State*, 234 Ga. 535, 537 (3) (216 SE2d 830) (1975), overruled on other grounds, *Drinkard v. Walker*, 281 Ga. 211, 217 n.38 (636 SE2d 530) (2006) ("When the

---

[4] Although Earwood's counsel expressed a desire "to have [the report] marked for identification, then entered as an exhibit," that apparently was not done.

14

document is prepared by a third person not in the presence of a witness, the memory is not refreshed by such memorandum and such testimony is inadmissible."); see also *Hall v. State*, 272 Ga. App. 204, 206-207 (2) (612 SE2d 44) (2005).[5] It follows that the trial court also did not err in denying Earwood's motion for new trial on this ground.

*Judgment affirmed. Miller, P. J., and Reese, J., concur.*

---

[5] The statute governing the admission of documents used to refresh a witness's recollection is OCGA § 24-6-612 (a) (" If a witness uses a writing to refresh his or her memory while testifying, an adverse party shall be entitled to have the writing produced at the hearing or trial, to inspect it, to cross-examine the witness on such writing, and to introduce in evidence those portions of such writing which relate to the testimony of the witness."). The cases cited herein were decided under a prior version of that statute, OCGA § 24-9-69, which expressly required that any witness using documentary evidence to refresh his or her recollection "[must] finally speak from his recollection thus refreshed or shall be willing to swear positively from the paper." We need not explore what impact, if any, the change in the statutory language has on the existing case law because under no set of circumstances can a witness's memory be "refreshed" by a document she cannot identify containing a report she cannot verify.