309 Ga. 488
FINAL COPY

S20A0721.   THOMAS v. THE STATE.

ELLINGTON, Justice.

A DeKalb County jury found Joseph Thomas guilty of murder and other crimes in connection with the shooting death of Gregory Savelio.[1] In his sole claim of error, Thomas contends that the trial

---

[1] Thomas was indicted by a DeKalb County grand jury on February 1, 2011, for malice murder (Count 1), felony murder (Counts 2-4), aggravated assault (Counts 5-6), and possession of a firearm by a convicted felon (Count 7) in connection with the shooting death of Savelio. After a trial held on September 16 to 20, 2013, the jury found Thomas guilty on all counts. On September 20, 2013, the trial court sentenced Thomas to life imprisonment without parole for malice murder (Count 1) and to five years' consecutive imprisonment for possession of a firearm by a convicted felon (Count 7). The court purported to merge the felony murder counts (2-4) (which were predicated on aggravated assault and possession of a firearm by a convicted felon) into the malice murder conviction. The court also merged the aggravated assault counts (5-6) with the malice murder conviction. Although the aggravated assault counts merge as a matter of fact with the malice murder conviction, the felony murder counts stand vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-374 (4)-(5) (434 SE2d 479) (1993). Thomas filed a motion for a new trial through new counsel on October 16, 2013, which he amended twice. A hearing on the motion was held on September 14, 2018, and the trial court denied it on October 23, 2018. After receiving an extension of time to file his notice of appeal, Thomas filed it on December 4, 2018. The appeal was docketed to the April 2020 term and submitted for decision on the briefs.

court erred in denying his *Batson*[2] challenge to the State's use of its peremptory strikes to remove African-Americans from the jury pool. Specifically, Thomas contends that the trial court failed to properly scrutinize whether the prosecutor's facially race-neutral reasons for striking Jurors 18, 31, and 42 were pretextual. He argues that the trial court's failure to apply *Batson*'s three-step analysis resulted in the court improperly shifting the burden to the defense to prove the prosecutor's discriminatory intent. As explained below, this claim of error is without merit; therefore, we affirm.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial shows the following. Around 5:30 p.m. on August 22, 2009, Thomas shot Savelio to death at a Chevron gas station on Candler Road in DeKalb County. Three witness testified that they heard a gunshot and saw a young man holding a black handgun. He was wearing a royal blue T-shirt with a red and black design on it. Two of the witnesses said that the shooter walked by them and, in an expletive-laden rant, announced that he had killed

---

[2] *Batson v. Kentucky*, 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986).

the victim. All three witnesses saw the shooter run toward the CVS pharmacy next to the gas station. One witness heard a car "screeching" away moments later.

Video surveillance from the side of the CVS building showed a man matching Thomas' general description run from behind the CVS and get into the front passenger seat of a blue Buick Skylark bearing a temporary tag with a September 22, 2009 expiration date. The man, however, was wearing an undershirt when he got into the car instead of the distinctive blue shirt seen by the witnesses to the shooting. Police found the blue shirt on the ground behind the CVS. The shirt was a Columbia High School senior-class T-shirt bearing the names of that year's seniors, including the name of the shirt's owner, Ashley Brooks.

Brooks testified that, on August 22, 2009, her former boyfriend, Thomas, was staying with her. She let him wear her class shirt. She testified that she spent that day with Thomas, hanging out at her house and running errands. Thomas let her drive his recently purchased blue Buick Skylark. One of the things they did that day

was to get a temporary tag for the car. Thereafter, they went to the Chevron station to get gas. While there, Thomas went inside the store. When he came back outside, he told Brooks to drive next door to the CVS parking lot without him. Moments later, Brooks heard a gunshot. She looked behind her and saw Thomas approaching the car. He was no longer wearing her class shirt. When he got into the car, he put a black handgun on the floorboard and told her to drive off. Thomas told Brooks that he had asked a man for money, and when the man laughed at him, he shot him. Thomas later called Brooks from Augusta and told her that the police had spoken with him and that she should give him an alibi for the day of the shooting.

The State also presented evidence that Thomas had committed other, similar crimes in the days before and after the shooting. A few days before Thomas shot and killed Savelio, he robbed Daryl Haynes as Haynes pumped gas at a Citgo gas station in DeKalb County. Haynes testified that Thomas — whom he positively identified from a photographic lineup and at trial — got out of a green SUV driven by a woman, approached him, drew a black handgun, and took his

money. Thomas got back in the car with the woman, later identified as Regina Truitt, and she drove away. Truitt testified at trial and corroborated Haynes' testimony. Truitt testified that, on the day Thomas robbed Haynes, he was in the process of buying a Buick from a family member.

The State also presented evidence that Thomas committed three more armed robberies at gas stations after he went to Augusta, on August 24, September 7, and September 10, 2009. Thomas was arrested after the September 10, 2009 robbery when the police, who were in the process of executing an arrest warrant for him, saw Thomas driving the Buick Skylark. Thomas abandoned the car and fled from the police on foot, but was quickly apprehended. The police recovered a 9mm black and silver Smith & Wesson pistol that they had seen Thomas discard as he ran from them.

The medical examiner testified that Savelio died as a result of a close-contact, through-and-through gunshot wound to the chest. The State did not perform forensic tests on Thomas' gun because the police found no bullet or shell casings for comparison at the gas

station where Savelio was shot. The State introduced into evidence numerous still images and video recordings from the various crime scenes, several of which showed Thomas or his car.

Thomas does not contest the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Thomas guilty beyond a reasonable doubt of the crimes for which he was convicted.[3] See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Thomas contends that his convictions should be reversed because the trial court failed to sufficiently evaluate the prosecution's reasons for its peremptory strikes to determine if those

---

[3] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, ___ Ga. ___ (___ SE2d ___) (2020). The Court began assigning cases to the December Term on August 3, 2020.

strikes were not pretexts for racial discrimination. Essentially, Thomas argues that the trial court did not conduct a full *Batson* analysis and that, if it had, it would have seen the State's discriminatory intent in striking African-American potential jurors. For the reasons that follow, this claim of error is without merit.

A *Batson* challenge involves three steps:

(1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven the proponent's discriminatory intent.

(Citation and punctuation omitted.) *Coleman v. State*, 301 Ga. 720, 723 (4) (804 SE2d 24) (2017). "At step two, the proponent of the strike need only articulate a facially race-neutral reason for the strike. Step two 'does not demand an explanation that is persuasive, or even plausible.'" *Toomer v. State*, 292 Ga. 49, 54 (2) (b) (734 SE2d 333) (2012) (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (115 SCt 1769, 131 LE2d 834) (1995)). And, at the third step of the *Batson* analysis, the trial court "makes credibility determinations,

evaluates the persuasiveness of the strike opponent's prima facie showing and the explanations given by the strike proponent, and examines all other circumstances that bear upon the issue of racial animosity." (Citation and punctuation omitted.) *Coleman*, 301 Ga. at 723 (4). That a prosecutor's explanation for a peremptory strike is not supported by the record or would apply equally to a similarly situated non-African-American juror who is permitted to serve may support a finding of discriminatory intent at *Batson's* third step. See *Miller-El v. Dretke*, 545 U. S. 231, 241-252 (III) (A) (125 SCt 2317, 162 LE2d 196) (2005). Finally, "[a] trial court's finding as to whether the opponent of a strike has proven discriminatory intent is entitled to great deference and will not be disturbed unless clearly erroneous." (Citation and punctuation omitted.) *Woodall v. State*, 294 Ga. 624, 627 (3) (754 SE2d 335) (2014); see also *Snyder v. Louisiana*, 552 U. S. 472, 477 (II) (128 SCt 1203, 170 LE2d 175) (2008) ("The trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and the best evidence of discriminatory

intent often will be the demeanor of the attorney who exercises the challenge[.]" (citations and punctuation omitted)).

The record shows that the prosecutor used seven of nine peremptory strikes to remove African-American jurors from the venire, one of whom (Juror 42) would have been an alternate. Ultimately, two African-American jurors were seated on the jury panel, one of whom was an alternate. After Thomas made his *Batson* challenge, the State conceded and the trial court agreed that Thomas had made out a prima facie showing of racial discrimination in the use of the State's peremptory strikes.[4]  Thereafter, the trial court asked the prosecutor to state the reasons for its peremptory strikes. When the prosecutor finished,[5] the trial court stated:

---

[4] Because the prosecutor offered explanations for the State's strikes at step two of the *Batson* inquiry and the trial court ruled on the ultimate question of intentional discrimination at step three, we need not decide whether the court correctly decided at step one the prima facie showing of racial discrimination. See *Johnson v. State*, 302 Ga. 774, 779 (3) (b) (809 SE2d 769) (2018).

[5] The record shows that the trial court asked defense counsel: "So, for the record, you only wanted to raise an argument . . . on Juror number[s] 18, 31 and 42?" Counsel responded: "That's correct, your honor." With respect to these jurors, the State gave the following explanations for exercising its peremptory strikes:

The burden is now going to shift to the defense concerning whether or not those were, in fact, race-neutral reasons. I will tell you that as part of step two of the inquiry, the court has to accept the explanation unless it is inherently discriminatory. And based on what I've heard thus far as to the reasons for[,] not just the strikes concerning the racial makeup and the gender makeup of the panel, but the reasons for the strikes in general, the court will state they do not appear to be inherently discriminatory. So now the burden shifts to the defense to respond.

Thomas then broadly asserted that the State's race-neutral reasons given with respect to Jurors 18, 31, and 42 were implausible. He complained that the prosecutor's explanation as to Jurors 18 and 42 were difficult to believe and that her explanation with respect to

---

Juror 18 volunteered that she has "two black sons." The prosecutor recalled that the juror looked over at the defendant "and her demeanor seemed to be one of sympathy. She seemed to have eyes that watered up a bit." When the juror was asked whether she, in fact, had sympathy for the defendant, she said "Yes." The prosecutor inferred from this exchange that the juror had sympathy for the defendant because he had reminded her of her sons. Based on this expression of sympathy, the prosecutor felt that Juror 18 was "not a suitable juror for the State."

Juror 31 was a social worker and, "based on the nature of her work" and the juror's comments about rehabilitation programs, the State was concerned that she would be predisposed to "not holding young persons accountable" for their crimes. (Thomas was 23 years old when he committed his crimes.)

Juror 42 had a grandson who had been shot and paralyzed. The juror made statements about the grandson's injury from which the State inferred that the juror was "not so much concerned with holding [the shooter] accountable. Based on that representation, the State felt that this juror would not be an appropriate juror for the State's case."

Juror 31 was "clearly speculation." When asked for specific responses to the State's explanations in support of its strikes, defense counsel argued that Juror 42 was a good juror for the State because her grandson had been the victim of a crime. He also said, however, that he had "no response" to the State's rationales for striking Jurors 31 and 42 and would "rest on his motion." With respect to Juror 18, he asserted that the record did not support the prosecution's belief that the juror's demeanor indicated sympathy for the defendant.

After hearing from defense counsel, the trial court ruled that Thomas had not articulated responses that adequately rebutted the State's race-neutral rationales for striking Jurors 18, 31, and 42; therefore, the court denied Thomas' *Batson* challenge. Moreover, the record shows that Thomas made no argument that the State had seated similarly situated white jurors or pointed to any other circumstances from which the trial court could reasonably infer that the prosecutor had a discriminatory intent in striking these jurors. Finally, during the hearing on Thomas' motion for a new trial, the

court reaffirmed its decision, noting that it was based in part on the court's "observation of jury selection and the prosecutor's explanations and credibility."

Based on the record before us, we discern no clear error in the trial court's ruling denying Thomas' *Batson* challenge. After hearing argument from both Thomas and the State and after explaining its reasoning, the trial court denied the *Batson* challenge as to Jurors 18, 31, and 42. The record indicates that the court assessed all of the circumstances before it and found no discriminatory intent in the State's use of its peremptory strikes, thereby fully engaging in the *Batson* inquiry. See *Coleman*, 301 Ga. at 724 (4). Further, although Thomas expressed doubt about the prosecutor's rationales for using peremptory strikes against the three jurors, he failed to make any factual argument in support of those doubts or in support of his claim that the prosecutor acted with discriminatory intent. The burden of persuasion is on the opponent of a strike to prove discriminatory intent, and Thomas failed to do that. See id. at 724 (4) n.7 ("(T)he ultimate burden of persuasion regarding racial

motivation rests with, and never shifts from, the opponent of the strike." (citation and punctuation omitted)). See also *Demery v. State*, 287 Ga. 805, 808 (2) (700 SE2d 373) (2010) (The opponent of a strike "may carry its burden of persuasion by showing that similarly-situated members of another race were seated on the jury." (citation and punctuation omitted)).

*Judgment affirmed. All the Justices concur.*

DECIDED AUGUST 10, 2020.
Murder. DeKalb Superior Court. Before Judge Jackson.
*Michael A. Eddings*, for appellant.
*Sherry Boston, District Attorney, Deborah D. Wellborn, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.