**THIRD DIVISION**
**DOYLE, P. J.,**
**HODGES and WATKINS, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 25, 2024**

# In the Court of Appeals of Georgia

A24A0926. GORDON v. THE STATE.

HODGES, Judge.

Following a jury trial, the Superior Court of Muscogee County entered a judgment of conviction against Dimitrius Gordon on five counts of armed robbery (OCGA § 16-8-41 (a)), three counts of aggravated assault (OCGA § 16-5-21), two counts of kidnapping (OCGA § 16-5-40 (a)), and one count of possession of a firearm during the commission of a crime (OCGA § 16-11-106). Gordon appeals from the trial court's denial of his motion for new trial as amended, arguing that: (1) the evidence was insufficient to support some of his convictions; (2) the trial court abused its discretion in admitting into evidence a rap music video to show plan, preparation, and

identity; (3) the trial court erroneously denied his *Batson*[1] challenge; and (4) he received ineffective assistance of trial counsel due to counsel's failure to move to sever his trial from that of his co-defendant, Michael Johnson. Finding no error, we affirm.

Viewed in a light most favorable to the verdict,[2] the evidence adduced at trial reveals that Gordon, also known as Slim Dizzy, was friends with Johnson. In fact, Johnson posted Gordon's bond for his release from the Russell County, Alabama jail on unrelated charges. Both were involved in the Columbus, Georgia-area rap music scene; Johnson claimed to be the leader of the RBN ("Real Boss N*****s") rap group, performers of "Hood Where I'm From" and the like.

*April 11, 2012 Winn-Dixie Robbery*. At approximately 10:45 p.m. on April 11, 2012, five men "came busting through the door" of the Winn-Dixie grocery store on Milgen Road in Columbus, Muscogee County. After they entered the store, one of the men ordered a cashier to lie on the floor, while another confronted a customer, threatened him, and took his cell phone. One of the assailants also demanded and took another customer's cell phone before running down an aisle.

---

[1] See *Batson v. Kentucky*, 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986).

[2] See *Floyd v. State*, 342 Ga. App. 438, 439 (1) (803 SE2d 597) (2017).

At some point, three of the masked men, who were armed and dressed in black clothing, entered the closing manager's office and demanded that he open the store's safe. When the manager informed the assailants that the safe was in another part of the store, a fourth masked man, who was larger and armed with a semiautomatic rifle, entered the room and instructed the other three to take the manager to the front of the store. While they led the manager to the cash office, the fourth man came back to the cashier and told her to "[s]tay down and don't move." As the three men began to empty the safe, the fourth man entered the room and told them to "[h]urry up, hurry up, hurry up" before finally telling them, "we got to go." The thieves then "grabbed the money and out the door they went."

Customers in the Winn-Dixie parking lot spotted the men running from the front entrance and piling into a small, light-colored vehicle; one of the men, who was of a smaller build, appeared to be dropping cash along the way. A customer in the parking lot attempted to pursue the vehicle to obtain a tag number, but broke off the pursuit near an adjacent apartment complex when someone inside the vehicle fired a gun at her. A couple unloading groceries at the apartment complex also heard what sounded like gunshots and saw someone running near the entrance to the complex

carrying something rectangular. Shortly thereafter, police learned that several items connected to the robbery were found at the apartment complex, including cash drawers, assorted coins, and two ski masks. An officer collected those items and, on his walk back to the store, located more coins and two additional ski masks. The robbers took a total of $9,709 from the store.

At trial, Xavier Bell, Jockas Gilchrist, and Sydney Person — three of the five participants in the Winn-Dixie robbery — identified Gordon and Johnson as the two other perpetrators; Bell and Gilchrist had previously pled guilty to their roles in the robbery. Bell, who served as a lookout for the Winn-Dixie robbery, testified that he and Person traveled from neighboring Phenix City, Alabama to Columbus in a Jeep Cherokee driven by another individual he did not know. Gilchrist and Gordon were passengers in a silver Toyota Corolla that Johnson drove to the scene. Upon arriving, Bell and the driver stayed in the Jeep while Person went inside Winn-Dixie to "case" the store. The Jeep then left the scene and drove toward an adjacent apartment complex where Bell and the driver were to meet the others in the Corolla following the robbery. Gilchrist and Gordon entered the store from the Corolla; Gordon was armed with a Glock handgun, and Bell and Person identified Gordon at trial from surveillance

4

footage by his red bandana. Johnson, armed with a semiautomatic rifle, then followed the others into the store.

Gilchrist and Gordon carried the cash out of the store, got into the Corolla with Johnson, and drove away. As the Jeep drove into the apartment complex moments later,[3] Bell, Gilchrist, and Gordon ran toward the Jeep and got in, and the Jeep sped away, heading back to Phenix City. Gordon was carrying a red bandana in his hand.

*May 5, 2012 Diamond Exchange Robbery*. At approximately 3:00 p.m. on May 5, 2012, two men rushed into the Diamond Exchange pawn shop in Columbus, Muscogee County. The men were armed, dressed in black, wore bandanas over their faces, and demanded cash and guns. The first man, who appeared to be "[a] little over six [feet]" tall and of average build, approached a sales clerk and ordered her to load cash and guns into a black bag. He then took the clerk to the back of the store, took more cash from a safe, and loosely tied the clerk's hands behind her back with a zip tie.

Meanwhile, the second man, who had a smaller build and was wearing a red bandana, jumped over a counter, confronted a pawn broker, and told her to lie down

---

[3] The Jeep took a short detour to a nearby Sonic restaurant.

or "he would shoot [her]." He then ordered her to open the counters and proceeded to place gold chains and watches in a black bag. A customer walked in on the robbery, and the second man ordered her to lie down; the customer had noticed a black sedan, later identified as a Lincoln LS, parked in front of the store as she entered. The first man emerged from the back of the store, said "let's go," and the two men fled the store in the black sedan. The pawn broker then telephoned 911. No useable fingerprints were discovered at Diamond Exchange. In all, the stolen items included gold chains with a combined value of $51,389.70, 36 handguns with a combined value of $11,064.60, watches with a combined value of $3,640.43, and $260.91 in cash.

Later that evening, Columbus police officers learned of an abandoned black Lincoln LS sedan parked in a highway median in Phenix City. The sedan had been involved in a chase with Phenix City police earlier that evening and crashed, resulting in the arrest of the driver, Johnson's cousin Dacquavian Solomon. Solomon and two other occupants who had been inside the vehicle at various times that evening, Kelsey Hixson and Daquarius Young, revealed that they traveled by taxi to Johnson's apartment late that afternoon and picked up the sedan from Johnson, who warned them, "you might want to be careful because this car is hot." Processing of the vehicle

6

revealed fingerprints, which were later identified as belonging to Johnson. One of the handguns stolen during the Diamond Exchange robbery was found on Gordon's person by Phenix City police on May 31, 2012. In a March 28, 2013 interview with law enforcement, Gordon claimed that he purchased the handgun from Johnson for $60.

During their investigation, police learned that Gordon had previously pled guilty to the robbery of the La Mexicana restaurant in Columbus. A review of the security footage from the La Mexicana robbery depicted a smaller-built man, consistent with Gordon's description, leaping over a counter during the robbery. Similarly, the smaller-built man shown in the Diamond Exchange robbery also jumped over the counter. An officer testified that, in working hundreds of robberies in the Columbus area, only one involved a suspect leaping over a counter.

A Muscogee County grand jury indicted Gordon for multiple crimes related to the Diamond Exchange and Winn-Dixie robberies. At trial, Gordon offered alibi testimony from Shenika Warren, the mother of his child, that the two were together on May 5, 2012 celebrating their dating anniversary and that he was not present for the Diamond Exchange robbery. Notwithstanding Gordon's alibi defense, a jury returned

7

guilty verdicts against Gordon on each count he faced, and the trial court denied his motion for new trial as amended. This appeal followed.[4]

1. Gordon first contends that the evidence was insufficient to support his convictions for Counts 18 through 21 and 23, arising from the May 5, 2012 Diamond

---

[4] Once again, we have a case in which there appears to be an inexplicable delay in post-trial review. The crimes occurred in April and May 2012, and Gordon was indicted in January 2015 and tried in June 2015. Amended motions for new trial were filed in December 2019 and February 2020, and a hearing on Gordon's motion as amended occurred in May 2021. The trial court entered its order denying Gordon's motion on June 24, 2021, but the case was not docketed in this Court until January 23, 2024.

> Although [Gordon] raises no claim of prejudice as a result of the delay, our Supreme Court has strongly rebuked delay in the resolution of post-conviction matters. As our Supreme Court explained, even if long-delayed appeals rarely result in outright reversals of convictions or only retrials or resentencings, these extended and unjustified delays in resolving criminal cases make our State's criminal justice system appear unfair and grossly inefficient. We must all work to prevent delays, particularly in the most serious of our criminal cases, that cannot be explained or justified to the parties in those cases, the victims of crimes, and the public we serve.

(Citation and punctuation omitted.) *Woods v. State*, 361 Ga. App. 259, 262, n. 6 (863 SE2d 738) (2021).

Exchange robbery, because the circumstantial evidence "failed to disprove" his alibi defense. He also asserts that the evidence of kidnapping during the April 11, 2012 Winn-Dixie robbery alleged in Count 16 was insufficient because the movement of the victim was incidental to the armed robbery itself, rather than forming the separate crime of kidnapping.[5] Neither argument is persuasive.

Our standard of review is well-settled:

> When reviewing the sufficiency of the evidence, the proper standard for review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979). [We do] not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence.

(Citations and punctuation omitted.) *Perdomo v. State*, 307 Ga. 670, 672 (2) (837 SE2d 762) (2020).

---

[5] Gordon does not challenge the sufficiency of the evidence for the remaining crimes related to the Winn-Dixie robbery, including armed robbery (Counts 12 through 14) and aggravated assault (Counts 15 and 17).

(a) *Counts 18-21 and 23.* With regard to his charges arising from the May 5, 2012 Diamond Exchange robbery,[6] Gordon contends that the evidence was purely circumstantial and that it was insufficient to "disprove" his alibi defense. We disagree.

> Under OCGA § 24-14-6, in order to warrant a conviction based solely upon circumstantial evidence, the proven facts must be consistent with the hypothesis of guilt and must exclude every reasonable theory other than the guilt of the accused. The evidence need not exclude every conceivable inference or hypothesis, only ones that are reasonable. The jury decides whether an alternative hypothesis is reasonable, and where a jury finds that the circumstantial evidence excluded every reasonable hypothesis save that of guilt, we will not disturb that finding unless it is insupportable as a matter of law.

(Citations and punctuation omitted.) *Perdomo*, 307 Ga. at 673 (2) (a).

Here, the evidence demonstrated that an armed smaller-built man, whose face was covered by a red bandana, rushed into the Diamond Exchange pawn shop, leapt over a counter, ordered a pawn broker to the floor and demanded that the pawn broker open the store's jewelry counters. The robber loaded gold chains and watches into a

---

[6] These charges included armed robbery (Counts 18 and 20), kidnapping (Count 19), aggravated assault (Count 21), and possession of a fiream during the commission of a crime (Count 23).

black bag as his partner filled another bag with cash and guns. The smaller man also pointed a handgun at a customer who entered the store during the robbery and forced her to the floor. Surveillance footage from the La Mexicana robbery, for which Gordon pled guilty, again showed a slightly-built man, whose appearance was consistent with Gordon's and whose face was concealed by a red bandana, jump over a counter to commit the robbery. Gordon wore a red bandana during the Winn-Dixie robbery less than one month prior to the Diamond Exchange robbery, and his associates identified him by his red bandana. Gordon was also later found to be in possession of a handgun taken during the Diamond Exchange robbery.

In his defense, Gordon relied upon Warren's alibi testimony that the two were together on May 5, 2012 celebrating their dating anniversary at the time of the Diamond Exchange robbery.

> Because the true effect of an alibi defense is to traverse the state's proof that the defendant committed the crime, a charge that the burden is on the state to prove that the defendant committed the crime beyond a reasonable doubt itself necessarily covers the question of whether the evidence of alibi was sufficient to create a reasonable doubt.

(Citation and punctuation omitted.) *Hollis v. State*, 359 Ga. App. 249, 254 (6) (b) (857 SE2d 254) (2021); see also *Rivers v. State*, 250 Ga. 288, 300 (8) (298 SE2d 10) (1982). The jury received appropriate charges on this point.[7] Accordingly, "it was for the jury to determine the credibility of the witnesses, and the jury was authorized to disbelieve the alibi defense Gordon proffered." (Citation and punctuation omitted.) *Gordon v. State*, 329 Ga. App. 2, 4 (1) (763 SE2d 357) (2014) (citing defendant's alibi evidence); see also *Hampton v. State*, 282 Ga. 490, 491 (1) (651 SE2d 698) (2007). Put simply,

> [a] defendant may choose to put forward evidence of alibi, but the jury may reject such evidence in favor of the State's proof of the indicted act. This determination is simply a resolution of conflicting evidence, a traditional role of the jury. Here, the jury heard [Gordon's] defense of alibi and rejected it in favor of the State's evidence. That was the jury's prerogative[, and] [w]e will not go behind it.

---

[7] The trial court's preliminary instructions included a charge that "[t]he State has the burden to prove each essential element of the crime charged beyond a reasonable doubt." The court's final jury charge also included instructions that "[t]he burden of proof rests upon the State to prove beyond a reasonable doubt the identity of this defendant as the person who committed the crime alleged in this bill of indictment" and that the burden of proof to show that the defendant was present "at the scene of the crime alleged or the defendant's involvement as a co-conspirator or as a party to the crime . . . rests upon the State to prove such beyond a reasonable doubt[.]" In addition, the verdict form instructed the jury that they could only find Gordon guilty if they "believe[d] beyond a reasonable doubt" that he "committed the offenses" listed in the indictment.

*Bacon v. State*, 249 Ga. App. 347, 349 (1) (b) (548 SE2d 78) (2001).

(b) *Count 16.* Turning to Gordon's kidnapping conviction from the April 11, 2012 Winn-Dixie robbery, Gordon's argument that the victim's movement "from the back office to the front office . . . for the purpose of opening the safe was not a kidnapping" is unavailing. OCGA § 16-5-40 (2012) provides:

> (a) A person commits the offense of kidnapping when such person abducts or steals away another person without lawful authority or warrant and holds such other person against his or her will.
>
> (b) (1) For the offense of kidnapping to occur, slight movement shall be sufficient; provided, however, that any such slight movement of another person which occurs while in the commission of any other offense shall not constitute the offense of kidnapping if such movement is merely incidental to such other offense.
>
> (2) Movement shall not be considered merely incidental to another offense if it:
>
> . . .
>
> (B) Makes the commission of the other offense substantially easier[.]

In this case, "the evidence was sufficient for a reasonable juror to conclude that the victim was moved for purposes of the statutory requirement." *Alexander v. State*, 348 Ga. App. 859, 865 (1) (b) (825 SE2d 405) (2019) (concluding evidence was sufficient to support kidnapping conviction where defendant duct-taped victim and moved victim to another room "to make it easier to commit [a] robbery"). The victim testified that three masked men entered his office at Winn-Dixie and demanded that he "open the safe." When the victim told the men the safe was not there and that it was in the cash office at the front of the store, the fourth man

> told the three guys . . . [to] pick [the victim's] a\*\* up and let's take him up front. So . . . they walked me towards the little hall and three of them was behind me and one was in front of me. And when we got to the hall, they hit me in the top of the head with the butt of the gun and I kind of went down and come back up. And I told him, I said if you hurt me, you won't get the door open. So they pushed me on to the front . . . of the cash office. And I was trying to get my keys out to open the door and they kept pushing me and hitting me in the back.

Based upon the victim's testimony, there was sufficient evidence for the jury to conclude that Gordon and the others moved the victim to make the robbery substantially easier, i.e., moving the victim to the safe's location. See OCGA § 16-5-40

14

(b) (2) (B); *Alexander*, 348 Ga. App. at 865 (1) (b). "As a result, the movement of [the victim] was not merely incidental to any other charged offense, and viewed in favor of the verdict, the evidence was sufficient to establish the asportation element of the kidnapping charge." (Citation and punctuation omitted.) *Floyd v. State*, 342 Ga. App. 438, 441 (1) (a) (803 SE2d 597) (2017) (concluding that moving victim from one floor to another and forcing her into brother's room made it "substantially easier . . . to commit armed robbery").

2. Next, Gordon asserts that the trial court erred in admitting Exhibit 63, a rap music video, into evidence to show plan, preparation, and identity because the video was unduly prejudicial. We find no plain error.

At the outset, we note that Gordon's lack of citations to the record has hampered review of this enumeration. See Court of Appeals Rules 25 (d) (1) (i) ("Each enumerated error shall be supported in the brief by specific reference to the record or transcript. In the absence of a specific reference, the Court will not search for and may not consider that enumeration."), 25 (d) (2) (outlining correct format for citations to the record).[8] The only record citation related to Gordon's argument

[8] This is particularly problematic in an appellate record from a trial involving two co-defendants and which is comprised of 26 volumes spanning more than 3,000

includes the pages where the exhibit was introduced at trial. When the State asked to lay a foundation for the video, Johnson's counsel asked for "the limiting instructions concerning what we discussed at the pretrial motions." The trial court gave a limiting instruction identifying the purpose of the evidence as preparation, plan, or identity, after which the State solicited foundational testimony and moved to admit the video into evidence. In response, Gordon's counsel only stated, "[t]he standing objection, Your Honor[,]" and the trial court admitted the video into evidence over the unspecified objection. There is no citation to a pretrial hearing at which the video may have been considered, a specific objection by Gordon, a request by Gordon for a limiting instruction, a specific ruling by the trial court on the video's admissibility (much less the trial court's reasoning), or the parameters of the "standing objection." See Court of Appeals Rule 25 (a) (5) ("At a minimum, the appellant's brief must include [. . .] [a] statement of the case that sets out the material facts relevant to the appeal, describes the relevant proceedings below, *and identifies how each enumerated*

---

pages.

*error was preserved for review, with appropriate citations to the record.*") (emphasis supplied). In short, we are faced with a nondescript "standing objection" without knowing the true basis of the objection.[9]

"[T]he burden is always on the appellant in asserting error to show it affirmatively by the record[,]" *Mathis v. State*, 299 Ga. App. 831, 835 (1) (b), n. 15 (684 SE2d 6) (2009), and "[a]s we have reiterated time and time again, this Court will not cull the record in search of error on behalf of a party." Id. at 834 (1) (b), n. 11. As a result, the posture of this enumeration — due to Gordon's failure to support the enumeration with record citations showing the basis and resolution of his objection — is the functional equivalent of having made no objection at all. When no evidentiary objection has been made, our review is confined only to plain error. See OCGA § 24-1-103 (d) ("Nothing in this Code section shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court."); *Armstrong v. State*, 310 Ga. 598, 604-605 (3) (852 SE2d 824) (2020).

---

[9] This is not an issue which can be casually overlooked. Our jurisdiction, or at the very least, our application of the correct standard of review, frequently depends upon whether an appellant raised a particular argument in the trial court or whether an appellant acquiesced in a trial court's proposed remedy.

The test to show plain error is well-settled:

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Citation and punctuation omitted.) *Martin v. State*, 369 Ga. App. 668, 671-672 (3) (894 SE2d 244) (2023). "If one prong of the plain error test is not satisfied, we need not address the other prongs of the test." *Burley v. State*, 316 Ga. 796, 803 (888 SE2d 507) (2023).

> Satisfying this high standard is difficult, as it should be. Consequently, an appellant's failure to specifically articulate how the alleged error satisfies this high standard increases the likelihood that his or her claims in this regard will be rejected.

(Citations and punctuation omitted.) Id.

The Supreme Court of Georgia recently outlined the framework for evaluating the admissibility of such videos under OCGA § 24-4-403, starting with the general notion that

> [e]vidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. Generally, relevant evidence is admissible. See OCGA § 24-4-402. The standard for relevance is a liberal one, and relevant evidence is admissible even if it has only slight probative value.
>
> Relevant evidence may nevertheless be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." OCGA § 24-4-403 ("Rule 403"). But the exclusion of evidence under Rule 403 is an extraordinary remedy that should be used only sparingly. . . . And prejudice is not unfair simply because it tends to inculpate the defendant in an awful crime. [Of course,] [i]nculpatory evidence is inherently prejudicial; it is only when *unfair* prejudice substantially outweighs probative value that Rule 403 permits exclusion. The prejudicial effect of evidence is unfair if the evidence has the capacity to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged, or an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.

(Citations and punctuation omitted.) *Wilson v. State*, 315 Ga. 728, 738 (8) (883 SE2d 802) (2023). See also *Baker v. State*, 318 Ga. 431, 440-441 (2) (a) (899 SE2d 139) (2024).[10]

"Pretermitting the remaining prongs of the plain error analysis, we conclude that [Gordon] cannot demonstrate the third prong: that the error affected the outcome of the trial court proceedings." (Citation and punctuation omitted.) *Rogers v. State*, 369 Ga. App. 543, 548 (3) (894 SE2d 85) (2023). Here, Person testified that the profanity-laden video for the song, "Hood Where I'm From," includes Gordon, Johnson, and Person filmed on Milgen Road in Columbus. Johnson is shown repeatedly posing with and pointing a semiautomatic rifle, while Gordon holds a handgun. Although the video, arguably, does not paint Gordon or Johnson in a particularly flattering light, we cannot say that any prejudicial effect of the video

---

[10] Although the State identified OCGA § 24-4-404 (b) ("Rule 404 (b)") in a pretrial motion, and Gordon cites and relies upon Rule 404 (b) in his argument, the Rule 404 (b) analysis does not apply to this video because it does not identify a specific wrongful "other act." See *Wilson*, 315 Ga. at 739-740 (8) (a) (holding that, although defendant's appearance in a rap video "may have cast [him] in an unflattering light, it did not do so *unfairly*" and that evidence was properly admitted under Rule 403) (emphasis in original); *Early v. State*, 313 Ga. 667, 671 (2) (b), n. 3 (872 SE2d 705) (2022) ("[T]here was no reference to a specific derogatory 'other act' in the video, and Appellant identifies no such act in his brief here. Thus, Rule 404 (b) did not apply.").

outweighed its probative value, showing Gordon and Johnson with weapons similar to those used in the robberies and filmed in the same neighborhood as the Winn-Dixie robbery. See, e.g., *Wilson*, 315 Ga. at 739-740 (8) (a) (confirming relevance of rap video introduced into evidence because it connected defendants and the murder weapon and because probative value did not outweigh unfair prejudice, noting that "[a] defendant's appearance in a rap video—even one like this one replete with obscenities and racial slurs—is not per se prejudicial"); *Oree v. State*, 280 Ga. 588, 592 (3) (630 SE2d 390) (2006) (concluding, under old Evidence Code, that "[e]vidence of a movie in a criminal defendant's possession which depicts the conduct with which the defendant is charged may be admissible to show the defendant's bent of mind and the fact that it may place the defendant's character incidentally into question does not make inadmissible what otherwise is relevant and material to the issues on trial") (citation and punctuation omitted). Even so, there was substantial evidence tying Gordon to the robberies at issue, such that the video, which largely featured Johnson, likely had little impact on Gordon. Under these circumstances, we find no plain error.

3. Gordon next argues that the trial court erred in denying his *Batson* challenge to the State's striking of eight out of ten Black jurors. We find no error.

Our courts have noted that a *Batson* challenge involves three distinct steps:

(1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven the proponent's discriminatory intent.

(Citation and punctuation omitted.) *Thomas v. State*, 309 Ga. 488, 490 (2) (847 SE2d 147) (2020).

(a) *Step One*. In this case, the parties agreed that the panel of 40 eligible jurors included 19 Black jurors (47.5 percent) and 21 White jurors (52.5 percent). From that number, the State struck eight Black jurors and two White jurors.[11] The racial makeup of the trial jury included seven Black jurors (58.33 percent) and five White jurors (41.67 percent). The trial court asked Johnson's counsel to identify the challenged jurors, a listing in which Gordon's counsel joined. The trial court did not evaluate the

---

[11] The defendants struck 11 White jurors, which initially led to a reverse *Batson* challenge by the State. However, the State withdrew the challenge after the trial court resolved the defendants' *Batson* challenge.

racial composition of the jury pool or of the trial jury and instead solicited explanations for the strikes from the State.[12]

Because "the trial court directed the State to explain its strikes, the preliminary question of whether [Gordon] had established a prima facie case of discrimination is moot." *Littlejohn v. State*, 320 Ga. App. 197, 200 (1) (739 SE2d 682) (2013); see also *Johnson v. State*, 302 Ga. 774, 779 (3) (b) (809 SE2d 769) (2018); *Toomer v. State*, 292 Ga. 49, 52 (2) (a), n. 2 (743 SE2d 333) (2012). We therefore turn to *Batson*'s second step and an examination of the State's reasons for striking the Black jurors.

(b) *Step Two*. As to the second step of the *Batson* analysis, we have noted that

the proponent of the strike need only articulate a facially race-neutral reason for the strike. Step two does not demand an explanation that is persuasive, or even plausible. At this second step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

---

[12] In fact, the State attempted to demonstrate that the defendants failed to make a prima facie case of discrimination by comparing the racial makeup of the jury pool and of the trial jury. However, the trial court declined to hear from the State and instead instructed the parties to proceed with their arguments concerning one of the jurors.

(Citation and punctuation omitted.) *Littlejohn*, 320 Ga. App. at 201 (1); see also *Thomas*, 309 Ga. at 490 (2).

(i) Juror No. 5. The State acknowledged that it "knew very little about that juror" and had "initially had that juror as one to keep." In fact, the prosecutor claimed that she had "written A in the box" to accept Juror No. 5, but that another person[13] interpreted the mark as an "X" to strike the juror. As a result, the State claimed that the juror had been struck for a race neutral reason.[14] The trial court concluded that the reason for striking Juror No. 5 was race neutral.

(ii) Juror No. 15. The State noted that the juror played an instrument and that she worked in health care, leading to a concern that she would be "incredibly

---

[13] The other person is identified in the record only as "Ms. Owens," who was first introduced as the trial court's "clerk" and was the person responsible for passing the jury list between counsel for the State and the defendants to record the parties' strikes. Although the State suggested that it might call Ms. Owens as a witness to describe the jury strike procedure, it does not appear that her testimony was ever received.

[14] Johnson's trial counsel suggested that Juror No. 5 be included in the trial jury and that the 12th juror be removed, but the State indicated "[t]hat's not something [it would] agree to." Gordon did not join Johnson's suggestion, and the trial court did not address Johnson's suggested remedy except to note that "there are several ways to go about [creating a remedy]."

compassionate, sympathetic and empathetic; and that's not what I'm looking for in a juror."[15] The trial court found the strike to be race neutral.

(iii) Juror No. 32. While the State appreciated the juror's military service, the juror's career in psychology suggested that she would be "compassionate or empathetic [and] would perhaps be trying to look at why someone acted or conducted themselves." The prosecutor also noted that the juror appeared to be smiling at Gordon "multiple times" and that she did not want "a juror who is remotely smiling at one of the defendants." Again, the trial court determined that the State's reasons for striking the juror were race neutral. See, e.g., *Taylor*, 303 Ga. at 632 (3).

(iv) Juror No. 39. The State noted that Juror No. 39 stated she was disabled but did not identify the nature of her disability, that she did not participate in answering additional questions, and that she was "glaring" at the prosecuting attorney on several

---

[15] Gordon claims the State's reasons for striking Juror No. 15 "operated as a proxy for discrimination[,]" likening the reasons to *Clayton v. State*, 341 Ga. App. 193, 198 (797 SE2d 639) (2017), in which this Court found "that having a full mouth of gold teeth is a cultural proxy stereotypically associated with African-Americans." We fail to see how playing an instrument or working in health care carry the same alleged cultural proxy, and we will not ascribe such a proxy to those factors. See, e.g., *Taylor*, 303 Ga. at 632 (3) (identifying "employment of the juror" as a "satisfactory race-neutral reason[]" for striking juror); *Trice v. State*, 266 Ga. 102, 103 (2) (464 SE2d 205) (1995) ("The nature of a prospective juror's employment is not a characteristic that is peculiar to any race.") (citation and punctuation omitted).

occasions. As a result, the State was not inclined "to pick someone who is already irritated on day three or four of being in the courtroom." The trial court found that a race neutral reason had been given for striking Juror No. 39.

In view of the foregoing, the trial court was authorized to conclude that the State's reasons for striking the jurors were race neutral.[16] See *Littlejohn*, 320 Ga. App. at 200-202 (1) (a) - (c).

(c) *Step Three*. "[A]t the third step of the *Batson* analysis, the trial court makes credibility determinations, evaluates the persuasiveness of the strike opponent's prima facie showing and the explanations given by the strike proponent, and examines all other circumstances that bear upon the issue of racial animosity." (Citation and punctuation omitted.) *Thomas*, 309 Ga. at 491 (2). "[A] trial court's finding as to whether the opponent of a strike has proven discriminatory intent is entitled to great deference and should not be disturbed unless clearly erroneous." (Citation and punctuation omitted.) *Reese v. State*, 361 Ga. App. 12, 13 (1) (862 SE2d 587) (2021).

---

[16] Gordon's reliance upon *George v. State*, 263 Ga. App. 541 (588 SE2d 312) (2003), and *Parker v. State*, 219 Ga. App. 361 (464 SE2d 910) (1995), for the proposition that a juror's demeanor is insufficient to support a race-neutral strike is misplaced inasmuch as those cases — and that principle — have been disapproved. See, e.g., *Taylor*, 303 Ga. at 632 (3); *Toomer*, 292 Ga. at 53-54 (2) (b); *Littlejohn*, 320 Ga. App. at 202 (1) (c), n. 3.

Here, the trial court did not individually address *Batson*'s third step; instead, it "implicitly engaged in the third step." *Coleman v. State*, 301 Ga. 720, 724 (4) (804 SE2d 24) (2017). After it solicited the defendants' objections to the State's strikes, the trial court asked for the State's explanation for each strike and then sought the defendants' responses to the State's reasons. See id. ("After hearing from both the prosecution and the defense, the trial court made its own findings (for each juror separately) about why it believed the prosecution's explanation was 'race neutral[.]' [. . .] Only after hearing from both sides and laying out its own findings on the matter did the trial court deny the *Batson* challenge as to each juror.").

> Thus, although the trial court used the term "race neutral" in its ultimate findings — a term usually employed in connection with the second *Batson* step — the record indicates that the court in fact assessed the totality of the circumstances and found no discriminatory intent in the State's use of peremptory strikes, thereby completing the *Batson* inquiry.

(Footnote omitted.) Id.; see also *Heard v. State*, 295 Ga. 559, 567 (3) (761 SE2d 314) (2014). Therefore, we find no clear error in the trial court's denial of Gordon's *Batson* challenge.

4. Finally, Gordon contends that he received ineffective assistance of trial counsel due to counsel's failure to move to sever his trial from Johnson's trial. We conclude that Gordon has failed to carry his burden to demonstrate error.

> To prevail on his claim of ineffective assistance of trial counsel, [Gordon] must prove both that counsel's performance was professionally deficient and that he was prejudiced by the deficient performance. To prove deficient performance, [Gordon] must show that his counsel performed in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms. Reasonable trial strategy and tactics do not amount to ineffective assistance of counsel. To prove prejudice, [Gordon] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. This burden is a heavy one. And if [Gordon] fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test.

(Citations and punctuation omitted.) *DeLoach v. State*, 308 Ga. 283, 287-288 (2) (840 SE2d 396) (2020).

For Gordon to succeed on his claim of ineffective assistance of trial counsel, he must demonstrate that a motion to sever would have been successful. See, e.g.,

*Robinson v. State*, 312 Ga. App. 736, 743 (3) (a) (719 SE2d 601) (2011). To that end, as the Supreme Court of Georgia has noted,

> OCGA § 17-8-4 (a) provides that, when two or more defendants are jointly indicted for a felony where the State does not seek the death penalty, such defendants may be tried jointly or separately at the discretion of the trial court. The relevant factors in ruling on a motion to sever are: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses.

(Citations and punctuation omitted.) *Terrell v. State*, 313 Ga. 120, 129 (4) (868 SE2d 764) (2022). "It is not enough for a defendant to raise the possibility that a separate trial would have given him a better chance of acquittal; a defendant is entitled to severance only where there is a clear showing of harm or prejudice and a showing that failure to sever would result in the denial of due process." (Citations and punctuation omitted.) *Pike v. State*, 302 Ga. 795, 798 (2) (809 SE2d 756) (2018).

In this case, Gordon has made no such showing. Gordon's primary argument is that "[t]here was a significant likelihood of confusion and undue prejudice at trial" because Johnson was separately charged with felony murder and other crimes

associated with an armed robbery at the "Gold and Silver" store in Columbus.[17] Trial counsel recalled a conversation concerning severing Gordon's trial from Johnson's, but could not recall why she did not file a motion to sever. However, trial counsel noted that Gordon and Johnson were tried together because the trial court granted the State's motion to admit prior convictions based upon the La Mexicana robbery. Moreover, after the trial's focus shifted to Johnson's murder charges, Gordon's trial counsel repeatedly noted on cross-examination — in the jury's presence, of course — that Gordon was not charged with murder in an effort to separate Gordon from Johnson.[18]

Gordon acknowledges that he and Johnson did not pursue defenses antagonistic to each other. Moreover, trial counsel addressed any potential confusion of the evidence against Gordon and Johnson, or the application of evidence implicating

---

[17] In fact, after testimony concerning the Diamond Exchange and Winn-Dixie robberies concluded, the next four days of testimony overwhelmingly focused on Johnson and his charges arising from the Gold and Silver robbery, including felony murder. However, the final witnesses in the case were Gordon's alibi witness and the State's rebuttal witness.

[18] The trial court noted the distinction in its jury charge, telling jurors that the charge on felony murder "applies only to Mr. Michael Johnson." The trial court also instructed the jury that "conviction of one defendant does not necessarily require conviction of another or all."

Johnson against Gordon, by reiterating — in the jury's presence — that Gordon was not charged with murder. Nor has Gordon pointed to any indication in the record which might demonstrate confusion by the jury concerning the evidence as it applied to Gordon and Johnson, such as notes submitted during the jury's deliberations.[19] And as it relates to the crimes for which Gordon and Johnson were jointly charged, "the jury arrived at guilty verdicts against [Johnson] as well as [Gordon], obviously accepting the State's case which was substantially the same for [Gordon] and [Johnson]." *Pike*, 302 Ga. at 799 (2).

In short, Gordon "completely fails to show that a motion to sever would have been granted." (Citation and punctuation omitted.) *Robinson*, 312 Ga. App. at 743 (3) (a). "There is nothing to suggest that the outcome of [Gordon]'s trial would have been different had he been tried separately from [Johnson]. Simply, [Gordon] has failed to demonstrate that he was prejudiced by the joint trial so that he was denied

---

[19] Aside from housekeeping matters, it appears that the jury's only substantive question involved re-watching video footage of the Diamond Exchange robbery.

due process[.]" *Pike*, 302 Ga. at 799 (2). As a result, Gordon's claim for ineffective assistance of trial counsel fails.[20]

*Judgment affirmed. Doyle, P. J., and Watkins, J., concur.*

---

[20] Because this Court was able to obtain complete and readable copies of each of the exhibits submitted at trial, Gordon's motion for remand is denied as moot.